# No. 25–1581

————————————

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

————————————

**MANUEL de JESUS ORTEGA,**
Petitioner,

v.

**PAMELA BONDI, United States Attorney General,**
Respondent.

————————————

**Petition for Review of a Final Order of the
Board of Immigration Appeals
Agency No. A 094–750–855**

————————————

**PETITIONER'S OPENING BRIEF**

————————————

Coryn R. Johnson
Kerry Q. Battenfeld
Jillian E. Nowak
Jhoanna F. Sylio
Karen Murtagh, Exec. Dir.
PRISONERS' LEGAL SERVICES OF NEW
   YORK
14 Lafayette Sq., Ste. 510
Buffalo, NY 14203
(716) 844–8266
kbattenfeld@plsny.org
*Counsel for Petitioner*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. I

TABLE OF AUTHORITIES.................................................................... III

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE .................................................................4

I.   MR. ORTEGA SUFFERS REPEATED SEXUAL AND PHYSICAL ABUSE IN EL
SALVADOR BECAUSE OF HIS SEXUALITY...................................................4

II.  MR. ORTEGA IS GRANTED WITHHOLDING OF REMOVAL UNDER THE
IMMIGRATION AND NATIONALITY ACT BY IMMIGRATION JUDGE SHAYNE
BURNHAM.......................................................................................12

III. IN REOPENED PROCEEDINGS, IMMIGRATION JUDGE ERIC SCHULTZ
DENIES MR. ORTEGA'S APPLICATION FOR DEFERRAL OF REMOVAL UNDER
THE CONVENTION AGAINST TORTURE IN A WRITTEN DECISION..............14

IV. THE BOARD OF IMMIGRATION APPEALS DENIES MR. ORTEGA'S APPEAL
AND AFFIRMS THE DECISION OF IMMIGRATION JUDGE ERIC SCHULTZ.....22

SUMMARY OF THE ARGUMENT .......................................................23

STANDARD OF REVIEW....................................................................28

ARGUMENT........................................................................................29

I.   THE AGENCY FAILED ANALYZE MR. ORTEGA'S PARTICULARIZED RISK
OF TORTURE. ..................................................................................29

A. The agency failed to consider Mr. Ortega's particular
circumstances by ignoring evidence of past torture and analyzing the

*risk to LGBTQ+ people generally, rather than to Mr. Ortega as a gay effeminate man.* ...............................................................29

*B. Rather than consider the country conditions evidence in a case-specific manner, the IJ erroneously dismissed the evidence as generalized in a conclusory and deficient analysis.* ..........................36

*C. The IJ failed to conduct an individualized analysis by ignoring the increased risk of harm associated with Mr. Ortega's sexuality in the detained context.* ...............................................................39

II. THE AGENCY FAILED TO ANALYZE MR. ORTEGA'S RISK OF FUTURE TORTURE IN THE AGGREGATE. ...............................................................41

III. THE AGENCY IMPROPERLY CONFLATED THE SPECIFIC INTENT AND PURPOSE REQUIREMENTS. ...............................................................46

*A. The IJ failed to properly consider Mr. Ortega's risk of torture in detention directly at the hands of individual actors.* .......................46

*B. The IJ improperly conflated the specific intent and purpose requirements.* ...............................................................51

IV. THE IMMIGRATION JUDGE APPLIED AN INFLATED STANDARD OF PROOF TO MR. ORTEGA'S CLAIM. ...............................................................54

V. THE IJ'S FACTUAL FINDINGS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE. ...............................................................55

*A. The IJ's finding that Mr. Ortega does not face a "more likely than not" risk of torture outside of detention is not supported by substantial evidence.* ...............................................................56

*B. The IJ's finding that Mr. Ortega would not likely be tortured with the specific intent of the Salvadoran government if detained was not supported by substantial evidence.* ...............................................................59

CONCLUSION ...............................................................68

CERTIFICATE OF COMPLIANCE ...............................................................70

CERTIFICATE OF SERVICE ...............................................................71

ii

# TABLE OF AUTHORITIES

**Cases**

*Acharya v. Holder,*
   761 F.3d 289 (2d Cir. 2014)................................................................52

*Andrade v. Bondi,*
   24-2806 (2d Cir. January 16, 2026) ...................................38, 48, 58, 65

*Avendano-Hernandez v. Lynch,*
   800 F.3d 1072 (9th Cir. 2015) ..........................................................34

*Barahona v. Garland,*
   No. 20-3063, 2023 WL 4926202 (2d Cir. Aug. 2, 2023).......................24

*Barwari v. Mukasey,*
   258 F. App'x 383 (2d Cir. 2007) ...................................................31, 35

*Cadet v. Bulger,*
   377 F.3d 1173 (11th Cir. 2004) ........................................................49

*Chen v. Bureau of Citizenship & Immigration Servs.,*
   470 F.3d 509 (2d Cir. 2006)........................................................28, 55

*Chen v. Gonzales,*
   417 F.3d 268 (2d Cir. 2005)..............................................................50

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) .........................................................................28

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.,*
   746 F.3d 42 (2d Cir. 2014)................................................................49

*Chun Gao v. Gonzales,*
   424 F.3d 122 (2d Cir. 2005)........................................................24, 54

*Doe v. Sessions,*
   886 F.3d 203 (2d Cir. 2018)..............................................................57

*Hamilton v. Whitaker,*
   759 F. App'x. 69 (2d Cir. 2019) ........................................................42

*Hui Lin Huang v. Holder,*
  677 F.3d 130 (2d Cir. 2012) .................................................................. 55

*Jean-Peirre v. United States AG,*
  500 F.3d 1315 (11th Cir. 2007) ........................................................... 49

*Kapoor v. DeMarco,*
  132 F.4th 595  (2d Cir. 2025) ................................................................ 3

*Khouzam v. Ashcroft,*
  361 F.3d 161 (2d Cir. 2004) .......................................................... 23, 54

*Lin v. U.S. Dep't of Just.,*
  432 F.3d 156 (2d Cir. 2005) .................................................................. 30

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024) ............................................................................ 28

*Malets v. Garland,*
  66 F.4th 49 (2d Cir. 2023) .................................................................. 28

*Marqus v. Barr,*
  968 F.3d 583 (6th Cir. 2020) ............................................................... 45

*Mendez v. Holder,*
  566 F.3d 316 (2d Cir. 2009) ................................................................. 57

*Mohideen v. Gonzales,*
  416 F.3d 567, 571 (7th Cir. 2005) ....................................................... 50

*Mu-Xing Wang v. Ashcroft,*
  320 F.3d 130 (2d Cir. 2003) ........................................................ passim

*Nasrallah v. Barr,*
  590 U.S. 573  (2020) ................................................................. 3, 28, 55

*Nuru v. Gonzales,*
  404 F.3d 1207 (9th Cir. 2005) ....................................................... 33, 34

*Ojo v. Garland,*
  25 F.4th 152 (2d Cir. 2022) ........................................................... 42, 45

iv

*Passi v. Mukasey,*
535 F.3d 98 (2d Cir. 2008) ................................................................. 37

*Pierre v. Gonzales,*
502 F.3d 109 (2d Cir. 2007) ........................................................ passim

*Poradisova v. Gonzales,*
420 F.3d 70 (2d Cir. 2005) .......................................................... 26, 42

*Quijada-Aguilar v. Lynch,*
799 F.3d 1303 (9th Cir. 2015) ........................................................... 41

*Sarr v. Garland,*
50 F.4th 326 (2d Cir. 2022) ................................................................ 3

*Shakkuri v. Barr,*
780 F. App'x 286 (6th Cir. 2019) ...................................................... 45

*Suzhen Meng v. Holder,*
770 F.3d 1071 (2d Cir. 2014) ...................................................... 25, 33

*Tambadou v. Gonzales,*
446 F.3d 298 (2d Cir. 2006) ........................................... 31, 32, 37, 38

*Velasquez-Samayoa,*
49 F.4th 1149 (9th Cir. 2022) ........................................................... 45

*Villalta Martinez v. Bondi,*
157 F.4th 108 (2d Cir. 2025) ..................................................... passim

*Yang v. U.S. Dep't of Justice,*
426 F.3d 520 (2d Cir. 2005) ............................................................. 28

## Administrative Decisions

*Matter of A-A-R-,*
29 I. & N. Dec. 38 (BIA 2025) ...................................................... 23, 66

*Matter of G-A-,*
23 I. & N. Dec. 366 (BIA 2002) ........................................................ 49

*Matter of H-C-R-C-,*
  28 I. & N. Dec. 809 (BIA 2024) .................................................. 31, 50, 59

*Matter of J-E-,*
  23 I. & N. Dec. 291 (BIA 2002) ........................................... 51, 66, 67, 68

*Matter of J-G-G-,*
  27 I. & N. Dec. 808 (BIA 2020) ......................................................... 39

*Matter of J-R-G-P-,*
  27 I. & N. Dec. 482 (BIA 2018) ..................................................... passim

## Federal Statutes

8 U.S.C. § 1229c ...................................................................................... 12

8 U.S.C. § 1231(b)(3) ......................................................................... 13, 15

8 U.S.C. § 1252(a)(1) ................................................................................ 3

8 U.S.C. § 1252(a)(2)(D) .......................................................................... 4

8 U.S.C. § 1252(a)(4) ..................................................................... 3, 24, 30

8 U.S.C. § 1252(b)(1) ................................................................................ 3

8 U.S.C. § 1252(b)(4)(B) ........................................................................ 28

## Federal Regulations

8 C.F.R. § 1208.16(c)(2) .............................................................. 24, 54, 55

8 C.F.R. § 1208.16(c)(3) .............................................................. 25, 26, 33

8 C.F.R. § 1208.16(c)(3)(i) ...................................................................... 30

8 C.F.R. § 1208.16(c)(3)(iii) .................................................................... 38

8 C.F.R. § 1208.18(a)(1) .................................................................. passim

8 C.F.R. § 1208.18(a)(5) .................................................................... 51, 52

8 C.F.R. § 1208.18.16(c)(2) ...................................................................... 24

8 C.F.R.§ 1208.18(a)(5) ........................................................................ 27

**State Statutes**

N.Y. Pen. L. § 130.25(2) ....................................................................... 15

## INTRODUCTION

As a gay, effeminate-presenting man, Manuel de Jesus Ortega ("Petitioner" or "Mr. Ortega") suffered near-constant abuse from the age of five until he first left El Salvador in his mid-twenties. As a child, Mr. Ortega was beaten by his parents, told by a caretaker that she wished him dead, attacked by peers, and held captive by adult men, where he was raped over the course of eight days. These abuses continued through adulthood, with death threats flung, weapons brandished, and gunshots fired at him. Gang members attacked Mr. Ortega's home. More than once, groups of men beat him to the point of hospitalization. Each time, the reason was clear: Mr. Ortega's sexual identity and effeminate appearance. In Salvadoran society, this identity marks him as disposable. When Mr. Ortega reported these abuses to the police, he was dismissed—told to "be a man" and left to his own devices. And so, after decades of violence, Mr. Ortega fled, seeking refuge in the United States.

Conditions in El Salvador remain dire for individuals like Mr. Ortega, a gay man who cannot hide his sexuality. He fears torture from family members, gang members, the Salvadoran government, and society at large. Mr. Ortega's case presents a prime example of why claims under

1

the Convention Against Torture ("Convention" or "CAT") must be analyzed in a holistic manner based on the applicant's particular circumstances. The stakes could not be higher, and Immigration Judges ("IJs") must treat these cases with the necessary care to conduct a meaningful analysis.

And yet, when presented with the litany of abuses Mr. Ortega suffered, the IJ failed to consider how Mr. Ortega's past harms showcased his particular vulnerability and likelihood of future torture. Instead, through a disaggregated analysis of Mr. Ortega's various risks, the IJ focused on the risk of harm to LGBTI+ people as a population at large and discounted credible evidence under the misnomer of "generalized."

These errors cannot stand. Permitting the agency to analyze life-or-death cases by recycling conclusory statements and failing to engage with the particularized evidence violates the United States' obligations under the Convention and runs counter to the established precedent of the Board of Immigration Appeals ("Board" or "BIA") and this Court.

//

//

//

2

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 8 U.S.C. § 1252(a)(1) to review the immigration agency's removal order against Petitioner Manuel de Jesus Ortega ("Petitioner" or "Mr. Ortega"). The agency's order became administratively final on June 11, 2025. Certified Admin. R. ("CAR") 1. Mr. Ortega timely filed a petition for review on June 25, 2025. *See* ACMS No. 1.1; *see also* 8 U.S.C. § 1252(b)(1) (establishing a thirty-day deadline to file a petition). Venue is proper before this Court because Mr. Ortega's removal proceedings took place before the Immigration Court in Batavia, New York. *See* CAR 81–97; *see also Sarr v. Garland*, 50 F.4th 326, 332 (2d Cir. 2022).

This Court has jurisdiction to review the Board's final order of removal under 8 U.S.C. § 1252(a)(1) and to review claims under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT" or "Convention") under 8 U.S.C. § 1252(a)(4). *See Nasrallah v. Barr*, 590 U.S. 573, 573 (2020); *Kapoor v. DeMarco*, 132 F.4th 595, 599 (2d Cir. 2025) (explaining that a petition for review of an immigration removal order under 8 U.S.C. § 1252 is the "sole and exclusive means for judicial

3

review of any cause or claim under the [Convention]"). This Court further has jurisdiction to review all "constitutional claims or questions of law" presented in this petition. 8 U.S.C. § 1252(a)(2)(D).

## STATEMENT OF THE ISSUES

1. Whether the Agency failed to analyze Mr. Ortega's particularized risk of torture.

2. Whether the Agency failed to properly conduct an aggregate analysis of Mr. Ortega's claims under the Convention Against Torture.

3. Whether the Agency failed to consider the risk of torture from individual actors in prison and misapplied the specific intent standard.

4. Whether the Agency applied an inflated burden of proof to Mr. Ortega's personal risk of future torture.

5. Whether Agency's factual findings are supported by substantial evidence.

## STATEMENT OF THE CASE

**I.** **MR. ORTEGA SUFFERS REPEATED SEXUAL AND PHYSICAL ABUSE IN EL SALVADOR BECAUSE OF HIS SEXUALITY.**

Manuel de Jesus Ortega was born on May 25, 1973, in Dulce Nombre de Maria, in the Ocotal village of Chalatenango, El Salvador. CAR 453, 877. A queer effeminate boy who grew into a queer effeminate

man, Mr. Ortega's life in El Salvador was marred by consistent abuse at every stage. *See* CAR 162 ("[S]ince I was little I have been what you would call a … bisexual, or a faggot.[1] That's what they would call me."). While living in Ocotal with his family, Mr. Ortega's parents refused to enroll him in school, despite enrolling his other siblings. CAR 163–65. As Mr. Ortega recalls, his parents "did not want anyone to find out that [he] was like a type of woman. . . . They did not want to be embarrassed." CAR 164; *see also* CAR 453–54 ("My parents were ashamed of me. Because of this, they did not send me to school.").

When Mr. Ortega was around five years old, he was raped several times by a man named Virigilio. CAR 165–66. After Mr. Ortega told his mother about the abuse, she refused to believe him. CAR 166, 453. Instead, "she got angry and she beat [Mr. Ortega]." CAR 165, 453.

This abuse marked merely the beginning, and Mr. Ortega grew well accustomed to beatings throughout his childhood. Each time, the reason was clear: Mr. Ortega's sexual identity. *See*, *e.g.*, CAR 280 ("I have received those names and those insults because of the way I am."). The

---

[1] As translated from "*culero*" in Spanish.

people in Chalatenango treated Mr. Ortega "very badly" and "always" called him a "faggot" and "son of a bitch" based on how he presented himself to the world. CAR 169.

In addition to the beatings from his mother, when Mr. Ortega was around seven years old, his parents briefly left him in the care of a woman named Yana. CAR 454. She beat him often, "with whatever she had in hand." *Id.* "She called [him] a 'bug' and a faggot and told [him] 'I wish you had died as a child.'" CAR 454; *see also* CAR 164. The blows Yana dealt the young Mr. Ortega came from some attempt to "change the way [he] was." *Id.* In her words, "she would make [Mr. Ortega] a man by pure blows if necessary." *Id.*; *see also* CAR 164.

Even in the face of such abuse, in 1982, at around age nine, Mr. Ortega accepted his sexuality. *Id.* One day, in Ocotal, a group of his peers caught Mr. Ortega and another boy kissing. *Id.*; CAR 167. The group began to beat the two boys because of this, calling them "faggots." *Id.*; CAR 167. As Mr. Ortega recalls, the attackers "said they would make our lives impossible." CAR 167. The beating left him with lasting scars. CAR 454. The attackers then told Mr. Ortega's parents about the kissing, and his parents "sent him in shackles" to farm coffee with a man named

6

Santiago for fifteen days. CAR 166–67; *see also* CAR 454. There, Santiago and his friend Julio, a twenty-year-old male, attempted to pressure the nine-year-old Mr. Ortega into having sex with Julio. CAR 454. When Mr. Ortega refused, Santiago beat him and brought him to Julio's home, where Julio held him captive and raped him repeatedly over the course of eight days. *See* CAR 168 ("[H]e would rape me and did whatever he wanted with me.").

In 1986, when Mr. Ortega was around age thirteen, his family left their home in Ocotal, Chalatenango and moved to Chalchuapa, Santa Ana. CAR 169. Just a few days after Mr. Ortega's arrival, the youth in that area noticed that he was "gay." *Id.*; CAR 454–55. At one point, three individuals beat him up, telling him he "deserved to die." CAR 455. When Mr. Ortega walked the streets of Chalchuapa with his parents, people would yell "there goes the faggot." *Id.* When they arrived home, Mr. Ortega's parents would beat him, asking "why did [he] have to be born like that." CAR 170, 455.

In 1988, when Mr. Ortega was around fifteen, his family moved to another village in El Salvador called El Pinalito, Caserío Las Marías,

Santa Ana. CAR 170; CAR 455. Again, shortly after Mr. Ortega's arrival, rumors spread that he was a "faggot." CAR 171.

In 1989, at just around sixteen years old, Mr. Ortega was again brutally beaten, this time by around three or four community members. CAR 171; 455. They beat him severely, saying "they did not want any faggots there" and that Mr. Ortega "had to leave." CAR 173; 455. They told him he "was a faggot and that [he] did not feel" and that he "was accustomed to pain" because he had sex with other men. CAR 455. For several days after the attack, Mr. Ortega suffered stomach pain to the point that he could not walk. *Id.* The pain forced him to go to the hospital, where he received surgery to address the complications from his injuries. CAR 172, 455. When Mr. Ortega returned home from the hospital, he lived in hiding for several months out of fear. CAR 455. He did not go to the police because his attackers had expressly threatened against that. CAR 172, 455.

Following this attack, in 1990, at seventeen years old, Mr. Ortega attempted to enlist in the army, hoping this role would change society's perception of him and grant him some form of protection by virtue of the uniformed position. CAR 175–76. However, because he was again

8

perceived to be a queer man, military officials denied him the possibility to enlist. CAR 175–76, 455. He instead served in El Pinalito's command headquarters as a military guard for the second infantry brigade of Santa Ana for two years, until 1992. CAR 238. This position, however, did not provide Mr. Ortega with the safety he sought.

One night, sometime in or around 1993, during a church vigil, the Commander of the Pinalito military guard, Mr. Ortega's former boss, hit Mr. Ortega in the back with his fist. CAR 456. Out of fear and not wanting to interrupt the service, Mr. Ortega stayed quiet. *Id.* Later that night, Mr. Ortega ran into the Commander again. *Id.* The Commander said, "You faggot son of a bitch, what are you doing in a church when you're a faggot?" *Id.* The Commander began to punch Mr. Ortega. *Id.* As Mr. Ortega began to defend himself, two more men came to the Commander's defense, one of whom struck Mr. Ortega's nose, breaking it. *Id.*

The next day, Mr. Ortega fled El Pinalito to stay with his aunt in Chalatenango. *Id.* On his way out of town, Mr. Ortega again encountered one of the men who had attacked him the night before. CAR 457. When the man saw Mr. Ortega, he said, pulling out a gun, "Where are you

9

going, faggot?" CAR 182. Fearing the man was going to kill him, Mr. Ortega pulled out his own gun and shot at the man, grazing him. CAR 182, 457. Though Mr. Ortega managed to escape, his mother later informed him that the Commander continued to question Mr. Ortega's whereabouts, wanting Mr. Ortega dead. *See* CAR 457.

Mr. Ortega returned to El Pinalito some years later. *Id.* He was again assaulted by the same group of men who had beaten him before in 1989. *Id.* They beat him "viciously" and threw rocks at him, as "always[,] for being a faggot." CAR 172, 457. One of the men slashed Mr. Ortega's hand with a *curvo*,[2] causing a deep laceration on his right palm connecting to his ring finger. CAR 172, 457. As they were beating Mr. Ortega, they repeatedly told him to leave the locale, that he should have already left because he was a "*culero*" or a "faggot." CAR 457. Mr. Ortega was again hospitalized. CAR 173, 457. To date, a scar remains on his right palm. CAR 457. Mr. Ortega went to the police. CAR 173. Rather than help him, police officers told him "they would not defend faggots, that if [he] was man enough [he] should defend [him]self[.]" *Id.*

---

[2] A curved blade.

In an attempt to be perceived as "straight," Mr. Ortega tried to hold relationships with women and raise a family. CAR 455, 458. In 2000, the man who had cut Mr. Ortega's right hand came to the house Mr. Ortega shared with his wife, Fidelina, and their children. CAR 458. The man brandished a pistol, yelling, "Get out of here faggot son of a bitch." CAR 458. The man shot into the air while Mr. Ortega and his family hid inside the house. CAR 458, 175. Several times thereafter, the home Mr. Ortega shared with his family was shot at. CAR 458. Mr. Ortega tried to file a police report against the man who had entered his home but was again told that if he was a real man, he would defend himself and kill the person who attacked him. CAR 458, 175.

Mr. Ortega fled El Pinalito for the Los Cedros borough of Santa Ana. CAR 458. Once again, this did not end the abuse. *Id.* Local gang members "harassed [Mr. Ortega] night and day." *Id.* They defiled his "home with homophobic insults." *Id.* As Mr. Ortega recounted, "[e]ven with women and children, everyone seemed to have a profound hatred for homosexual people." *Id.*

Following decades of abuse and multiple refusals by police to help, in 2000, Mr. Ortega finally fled El Salvador for the United States. *Id.* In

11

2008, following a conviction for driving while intoxicated, Mr. Ortega was placed in removal proceedings. CAR 186, 460. Upon the advice of his immigration attorney, despite fearing return, he accepted voluntary departure[3] and returned to El Salvador. CAR 188. A matter of days after his return, Mr. Ortega was chased by a group of purported gang members who yelled, "stop, faggot[,] stop." CAR 188, 460. The men caught him and, in yet another gruesome attack, cut him in the leg with a machete. CAR 188, 460. This time, Mr. Ortega did not go to the police, recalling that "every time [he] would go[,] they never wanted to help [him] with anything." CAR 189. Because of this attack, just days after returning to the country, Mr. Ortega again fled El Salvador for the United States, where he resided until his deportation to El Salvador at following the conclusion of his proceedings before the Agency. *See* CAR 189, 460–61.

## II. MR. ORTEGA IS GRANTED WITHHOLDING OF REMOVAL UNDER THE IMMIGRATION AND NATIONALITY ACT BY IMMIGRATION JUDGE SHAYNE BURNHAM.

On July 2 and July 9, 2019, Mr. Ortega appeared with counsel for an individual hearing ("IH") before Immigration Judge ("IJ") Shayne

---

[3] An ordering granting voluntary departure allows a noncitizen in removal proceedings to leave the United States by a date certain without being subject to a removal order. *See* 8 U.S.C. § 1229c.

Burnham ("IJ Burnham"). *See* CAR 151, 257. At his hearing, Mr. Ortega provided detailed, credible testimony about the consistent abuse he suffered in El Salvador and was cross-examined extensively by counsel for the Department of Homeland Security ("DHS"). *See* CAR 151–292.

Detailing his brief stay in the country in 2008, which had resulted in yet another vicious attack, Mr. Ortega explained: "They had wanted to kill me many other times and this time they also wanted to kill me . . . the best thing for me to do was to leave." CAR 189. He further explained in his testimony his vehement belief that he would be killed if he returned to El Salvador. CAR 194. When asked by counsel if he could move somewhere else in El Salvador to be safe, Mr. Ortega explained: "I've already moved many times and I've had the same problems." *Id.*

At the conclusion of the IH, IJ Burnham issued an oral ruling granting Mr. Ortega withholding of removal under 8 U.S.C. § 1231(b)(3). CAR 295; 1565. IJ Burnham found that Mr. Ortega had testified credibly and sufficiently corroborated his application. CAR 293. She found that Mr. Ortega had suffered "past persecution based on everything that he testified to as to his childhood, adulthood and then when he returned to

El Salvador … in 2008[.]" CAR 293. IJ Burnham further found that Mr. Ortega:

> established a well founded fear of future persecution . . . based on the extensive country conditions evidence that show that LGTBQ individuals are highly stigmatized, discriminated against and suffer acts of violence and other abuses by police, security forces, gang members and the community at large. . . . [T]he persecution [Mr. Ortega] suffered was on account of a protected ground, i.e., his sexual orientation, being a gay or bisexual man. . . . [T]he government of El Salvador was unwilling or unable to protect [Mr. Ortega] based on the country conditions . . . and the fact that he had . . . attempted to report his attackers twice to police and that the police refused to take his statement stating he was a homosexual, but in derogatory terms.

CAR 293–94.

IJ Burnham declined to reach Mr. Ortega's CAT application given her ruling on withholding of removal. CAR 294. Both parties accepted the decision as final and waived appeal. CAR 295.

### III. IN REOPENED PROCEEDINGS, IMMIGRATION JUDGE ERIC SCHULTZ DENIES MR. ORTEGA'S APPLICATION FOR DEFERRAL OF REMOVAL UNDER THE CONVENTION AGAINST TORTURE IN A WRITTEN DECISION.

On March 6, 2024, the Department moved to reopen Mr. Ortega's case and terminate Mr. Ortega's prior grant of withholding of removal

14

under 8 U.S.C. § 1231(b)(3) based on an August 29, 2022 conviction of rape in the third degree in violation of New York Penal Law ("N.Y.P.L.") § 130.25(2). CAR 1560–64. On April 12, 2024, IJ Burnham granted the Department's motion to reopen. CAR 1558. Shortly thereafter, Mr. Ortega's case was transferred from the New York City docket to Batavia Immigration Court.

On August 26, 2024, Mr. Ortega, through counsel, filed an opposition to the Department's motion to terminate his grant of withholding of removal. On September 6, 2025, IJ Eric Schultz ("IJ Schultz) issued a brief written decision granting the Department's motion to terminate. CAR 1549–1551.

Following the termination of withholding, Mr. Ortega, represented by counsel, presented the merits of his application for deferral of removal under the CAT ("DCAT") before IJ Schultz. Prior to the IH, Mr. Ortega amended his Form I-589, testified regarding his changed circumstances including that his daughter is affiliated with a gang in El Salvador, CAR 413–13, and submitted updated country conditions evidence, CAR 1153–1534. He also submitted a detailed report ("Expert Report") by his expert witness, Miranda Cady Hallett ("Dr. Hallett"), Director of Human Rights

Studies and Associate Professor of Cultural Anthropology at the University of Dayton in Ohio. CAR 1097–1147. Dr. Hallett's report focused on the changed conditions in El Salvador since Mr. Ortega was granted withholding of removal. In her report, Dr. Hallett concluded that, "[s]hould he return to El Salvador, Mr. Ortega is more likely than not to face assault, torture, or death at the hands of either the gangs or the government of El Salvador." CAR 1145.

On October 15, 2024, the parties appeared for an IH before IJ Schultz. CAR 348–436. Mr. Ortega presented several claims ("theories of torture") based on multiple converging risk factors. CAR 429–30. First, Mr. Ortega argued that he will likely be detained immediately upon arrival to El Salvador "and taken to a prison where he would suffer conditions rising to the level of torture regardless of his sexuality," with an increased risk of torture and death if his sexuality is discovered in this context. CAR 429–30. Second, Mr. Ortega argued that, if not detained immediately, he faces a risk of torture from "the police, gangs[,] or members of the community" because of his sexual identity, his criminal conviction and deportee status (which will render him homeless, forcing him to move from place to place), and his daughter's gang affiliations.

16

CAR 429. He argued that such torture would occur either outside of prison, or these factors would separately lead to Mr. Ortega's later detention and torture. CAR 429.

Dr. Hallett testified first in support of these claims, providing a credible account of how El Salvador has changed since Mr. Ortega was granted withholding in 2019. CAR 89 (finding that Dr. Hallett testified credibly). Regarding the treatment of LGBTI+[4] individuals in El Salvador, Dr. Hallett explained that LGBTI+ people are "considered part of an undesirable group by the vast majority of Salvadoran society, including, and perhaps especially, . . . [by] armed groups like the gangs, death squads and police and the military[.]" CAR 371. To many in Salvadoran society generally, LGBTI+ individuals are "disposable persons." CAR 372. Dr. Hallett also explained that effeminate presenting men like Mr. Ortega face a noticeably different reality from the LGBTI+ population at large. CAR 375–76. First, men are five times more likely to be subject to arrest than women. CAR 375. Second, women who behave

---

[4] Mr. Ortega uses the term LGBTI+, as used by his expert witness, Dr. Hallett. Other acronyms commonly used include LGBTQIA or LGBTQIA+.

17

in ways associated with masculinity are less at risk of violence, harassment, and threats than men who are effeminate. CAR 376. Ultimately, across the spectrum, the police do not protect LGBTI+ individuals. CAR 376.

Regarding the conditions in Salvadoran prisons, Dr. Hallett emphasized that the prisons' general conditions amount to torture under international standards. CAR 403. In support of this point, Dr. Hallett highlighted the existence of "hundreds of testimonies from detained people who testified a specific intentional torture, such as . . . electric shock, . . . beating, sometimes leading to pulmonary edema and death, … severe isolation for extended periods of time. *Id.* Ultimately, she explained, "it is very clear that . . . in . . . recent years . . . there is explicit and intentional torture happening within the prison[s]." CAR 403–04.

When asked about the likelihood that something rising to the level of torture would occur to Mr. Ortega, Dr. Hallett responded:

> Based on the conglomeration of all of the evidence, including his underlying risk as an LGBTI+ person, as a gender non-conforming person, based on . . . my reading of his past experience, which is quite . . . extreme and violent, and my understanding of the conditions on the ground currently, . . . with a very . . . anti-LGBTI+ administration in place, and a condition of a weak rule of law . . . I conclude that it's very likely.

18

CAR 384–85. She further predicted that "within a year, certainly within five years of arriving in the country, . . . [Mr. Ortega] would encounter violence rising to the level of torture . . . due to these risk factors." CAR 385. When asked to provide a percentage, she explained that, "[a]s an anthropologist . . . I really dislike quantifying these kinds of things because there are so many unpredictable dynamics . . . but . . . based on the repeated surveys with individuals who are somewhat similarly situated and based on the fact that he is not only LGBTI+ but has these other factors I would say it's more than 70%." *Id.*

Following Dr. Hallett's testimony, Mr. Ortega provided a credible account of his past harms. *See* CAR 89 (finding Mr. Ortega testified credibly). He explained that he "already had problems years ago" due to his sexuality, CAR 409, and that many individuals already know, "[a]s a matter of fact," of his sexuality. CAR 410. When asked if he could hide his sexuality if deported to El Salvador, Mr. Ortega testified that

> unfortunately I have gone through a lot of—a lot of suffering because of it. … [E]ven though some people might not know that I am [gay] they might come to the conclusion that I am and I suffered a lot due to that in the past." CAR 410. Ultimately, he explained, "there's certain things that one cannot hide away in your behavior, the way you are[.]

19

CAR 411.

In a written decision dated December 20, 2024, IJ Schultz denied Mr. Ortega's application for CAT protection. CAR 81–97. With respect to Mr. Ortega's past harm in El Salvador, IJ Schultz "assume[d] that [Mr. Ortega] experienced past torture" but noted, without further explanation, that "no presumption of future torture arises based on this finding." CAR 92.

Regarding Mr. Ortega's risk of future harm, the IJ first assessed Mr. Ortega's risk in the non-detained context. CAR 92–94. The IJ concluded that Mr. Ortega's fears from those who had already harmed him were "too speculative to meet the standard for CAT protection." CAR 92. The IJ then addressed Mr. Ortega's risk of harm from others outside of detention, based solely on his sexuality. CAR 93. Dismissing this claim as well, the IJ found that "while [Mr. Ortega] is extremely vulnerable to violence in El Salvador, the Court finds that this vulnerability to violence does not equate to the necessary likelihood of experiencing torture." CAR 93. Specifically, IJ Schultz found that "while [Mr. Ortega] may be identified as being effeminate or sexually attracted to men and targeted for violence, this evidence does not demonstrate that he will be harmed

20

rising to the level of severity constituting torture[.]" CAR 93. Referencing the country conditions evidence, the IJ dismissed this theory altogether, finding the "poor conditions [in]sufficient to demonstrate that it is more likely than not that LGBT persons will experience torture." CAR 93. Finally, the IJ turned to Mr. Ortega's risk of harm outside of detention based on his criminal deportee status and daughter's gang affiliation, separately dismissing it as speculative as well. CAR 93–94.

With respect to Mr. Ortega's risk of torture if he was detained under the state of exception,[5] IJ Schultz concluded that:

> [T]he evidence fails to establish that [Mr. Ortega's] anticipated treatment in Salvadoran prisons will more likely than not rise to the level of torture. For example, arbitrary detentions, failure to maintain hygiene, overcrowding in holding cells, and outbreaks of diseases does not constitute a sufficient likelihood of torture under CAT unless these conditions are sufficiently extreme and inflicted intentionally to cause severe pain and suffering. The Court notes the country conditions evidence that reports systematic abuse in the Salvadoran prison system, including beatings by guards, sporadic complaints of mistreatment by police, and use of electric shocks. However, the Court finds that these conditions do not appear to be intentionally inflicted for the purposes of torture. Instead, they are secondary or tangential

---

[5] The state of exception, enacted in March 2022, is a national law of El Salvador under which known or suspected gang members may be arrested and imprisoned with little to no due process. *See* CAR 1317–1325.

results of El Salvador's implementation of discipline implementing an aggressive policy to combat gang and criminal problems as supported by the record evidence and Dr. Hallett's affidavit.

CAR 95 (internal citations omitted).

Accordingly, IJ Schultz ordered Mr. Ortega removed to El Salvador. CAR 96.

## IV. THE BOARD OF IMMIGRATION APPEALS DENIES MR. ORTEGA'S APPEAL AND AFFIRMS THE DECISION OF IMMIGRATION JUDGE ERIC SCHULTZ.

Mr. Ortega timely appealed to the Board of Immigration Appeals ("Board" or "BIA"), arguing that the IJ's denial of Mr. Ortega's claim under the Convention was premised on multiple legal and factual errors. CAR 7–33. The Board denied the appeal, "adopt[ing] and affirm[ing] the decision of the Immigration Judge" with little to no additional analysis. CAR 4.

Regarding Mr. Ortega's claim under the Convention, the Board found that the IJ had "permissibly considered [Mr. Ortega's] evidence of past torture in El Salvador[,]" generally citing to IJ Schultz's analysis at pages ten through eleven (CAR 91–92) of his decision. CAR 4. The Board found "no error in the Immigration Judge's weight of the evidence" or his factual findings. CAR 4–5. The Board explained that "[t]he Immigration

Judge had properly considered the totality of the circumstances . . . in determining that [Mr. Ortega] did not meet his burden of proof." CAR 5. Finally, the Board cited *Matter of A-A-R-*, 29 I. & N. Dec. 38 (BIA 2025) to support the Immigration Judge's finding that Mr. Ortega, "if incarcerated, is not more likely than not to be tortured, and that prison conditions are not clearly the result of a specific intent to torture." CAR 5–6. Mr. Ortega timely petitioned this Court for review. *See* ACMS 1.1.

## SUMMARY OF THE ARGUMENT

Mr. Ortega faced decades of violence as a gay, effeminate man in El Salvador. The evidence of the countless abuses inflicted upon Mr. Ortega—by many individuals, both state-actors and not—is documented and clear. So too are the risks Mr. Ortega faces upon return to the country. And yet, when presented with credible evidence supporting these risks, the IJ turned the other cheek, committing multiple, independent legal errors in the process.

The Convention Against Torture ("CAT") "expressly prohibits the United States from returning any person to a country in which it is more likely than not that he or she would be in danger of being subjected to torture." *Khouzam v. Ashcroft*, 361 F.3d 161, 168 (2d Cir. 2004); 8 C.F.R.

§ 1208.16(c)(2). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted . . . by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18.16(c)(2). The more likely than not standard "requires the applicant to establish that there is a greater than fifty percent chance . . . that he will be tortured. *Chun Gao v. Gonzales*, 424 F.3d 122, 128–29 (2d Cir. 2005) (quotation marks omitted). Whether an applicant meets this threshold "must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible . . . claims." *Matter of J-R-G-P-*, 27 I. & N. Dec. 482, 484 (BIA 2018) (quotation marks omitted). Ultimately, an applicant is "required only to show that someone in 'his particular alleged circumstances' would more likely than not be tortured." *Barahona v. Garland*, No. 20-3063, 2023 WL 4926202, at \*2 (2d Cir. Aug. 2, 2023) (quoting *Mu-Xing Wang v. Ashcroft*, 320 F.3d 130, 144 (2d Cir. 2003) *superseded by statute on other grounds*, 8 U.S.C. § 1252(a)(4)).

Here, the IJ misapplied the CAT standards in four ways that the BIA failed to rehabilitate. Ultimately, remand is required.

<u>First</u>, the IJ failed to properly analyze Mr. Ortega's particularized risk of torture considering "his particular alleged circumstances." *Mu-Xing Wang*, 320 F.3d at 144. This issue materialized through multiple distinct errors.

For one, in determining Mr. Ortega's risk of harm in the non-detained context, the IJ failed to consider the undisputed evidence of Mr. Ortega's past torture as "evidence relevant to the possibility of future torture[.]" 8 C.F.R. § 1208.16(c)(3). Instead, the IJ simply rested on the legal conclusion that evidence of past torture does not lead to a "presumption of future torture." CAR 92 (citing *Suzhen Meng v. Holder*, 770 F.3d 1071 (2d Cir. 2014)).

Discarding Mr. Ortega's relevant history of past harms, the IJ analyzed the risk of harm to LGBTI+ people generally, rather than the risk of harm to Mr. Ortega, or someone in his "particular alleged circumstances." *Mu-Xing Wang*, 320 F.3d at 144.

The IJ similarly discarded much of Mr. Ortega's particularized evidence relating to his future risk of harm. Rather than address the country conditions evidence in a case-specific manner, the IJ rested on yet another unreasoned legal conclusion, simply citing the contention

that "generalized evidence of violence . . . in a country . . . is insufficient." CAR 92. At no point does the IJ explain *how* Mr. Ortega's country conditions evidence detailing risks faced specifically by LGBTI+ people— a group to which he belongs—and a report by expert witness Dr. Hallett outlining Mr. Ortega's individualized risks constitute mere "generalized evidence." *Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir. 2005) (requiring "a certain minimum level of analysis from the IJ and BIA").

Finally, the IJ failed to even mention Mr. Ortega's sexuality—let alone analyze—in his discussion of the risk of harm Mr. Ortega would face if detained in a Salvadoran prison. Instead, the IJ analyzed the risk of harm to all Salvadoran prisoners in general without consideration of Mr. Ortega's "particular alleged circumstances." *Mu-Xing Wang*, 320 F.3d at 144.

Second, the IJ failed to properly analyze Mr. Ortega's risk of torture in the aggregate. *See Villalta Martinez v. Bondi*, 157 F.4th 108, 115 (2d Cir. 2025) (citing 8 C.F.R. § 1208.16(c)(3) ("The agency is required to consider the risk of torture in the aggregate."). Under a properly aggregated analysis, the agency must consider all claimed sources torture cumulatively, rather than as isolated factors. *Matter of J-R-G-P-,*

26

27 I. & N. Dec. at 484. By dismissing each of Mr. Ortega's claims one by one without consideration of their cumulative significance, the IJ committed legal error.

Third, the IJ erroneously dismissed Mr. Ortega's risk of torture if detained in a Salvadoran prison by focusing solely on whether the Salvadoran government intentionally maintains the general conditions in its prisons "for the purposes of torture." CAR 95. In doing so, the IJ failed to properly consider Mr. Ortega's risk of torture directly at the hands of prison guards while improperly conflating the intent and purpose requirements as articulated by the governing regulations under 8 C.F.R. § 1208.18(a)(1); *see also* 8 C.F.R.§ 1208.18(a)(5).

Fourth, the IJ applied an inflated burden of proof to Mr. Ortega's claim, dismissing one of Mr. Ortega's claims in the non-detained context by reason that the "evidence does not demonstrate he *will* be harmed rising to the level of severity constituting torture[.]" CAR 93 (emphasis added). Such goes well beyond the "more likely than not" standard of proof.

Finally, considering the record as a whole under the proper legal standards, substantial evidence does not support the agency's finding

that Mr. Ortega failed to meet his burden of proof in establishing a more likely than not risk of torture—both in the detained and non-detained contexts.

## STANDARD OF REVIEW

This Court "review[s] the judgment of the IJ as modified by the [Board's] decision[.]" *Yang v. U.S. Dep't of Justice*, 426 F.3d 520, 522 (2d Cir. 2005). This Court reviews questions of law *de novo*. *See Chen v. Bureau of Citizenship & Immigration Servs.*, 470 F.3d 509, 513 (2d Cir. 2006). It reviews the agency's factual findings for "substantial evidence," treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Nasrallah*, 590 U.S. at 583–84. Under the "substantial evidence" standard, the agency's factual findings must be supported by "reasonable, substantial and probative evidence in the record." *Malets v. Garland*, 66 F.4th 49, 53 (2d Cir. 2023) (internal citation omitted).

In light of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) which overruled *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), federal courts may no longer defer to agency interpretation of ambiguous statutes and "must

28

exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. at 412.

## ARGUMENT

### I. THE AGENCY FAILED ANALYZE MR. ORTEGA'S PARTICULARIZED RISK OF TORTURE.

While living in El Salvador, Mr. Ortega was repeatedly identified as a gay, effeminate man and targeted for harm on that basis—harm including rape, repeat beatings, and death threats. CAR 162–76; CAR 453–58. This history of harm demonstrates that Mr. Ortega is more likely than not to suffer similar treatment in the future. Country conditions evidence detailing continued abuses against similarly situated individuals and expert witness testimony corroborate his claim. However, by discounting Mr. Ortega's own lived experiences for the wider treatment of LGBTI+ individuals in society, the IJ missed the forest for the trees. The IJ's generalized assessment thus erroneously ignored Mr. Ortega's particularized risk of harm. Remand is required.

> **A. The agency failed to consider Mr. Ortega's particular circumstances by ignoring evidence of past torture and analyzing the risk to**

29

**LGBTQ+ people generally, rather than to Mr. Ortega as a gay effeminate man.**

Failing to consider how Mr. Ortega's extensive history of past harm impacts his risk of future torture, the agency erroneously equated Mr. Ortega's particular circumstances with those of all LGBTQI+ individuals at large.

The Agency must analyze whether an applicant's particular circumstances make it more likely than not that the applicant will be tortured. *See, e.g. Lin v. U.S. Dep't of Just.*, 432 F.3d 156, 160 (2d Cir. 2005) (noting that the standard was whether the "specific sub-population of repatriated citizens are generally tortured in Chinese prisons" not prisoners/detainees generally); *Mu-Xing Wang*, 320 F.3d at 144 *superseded by statute on other grounds*, 8 U.S.C. § 1252(a)(4) (noting that the issue was whether "someone in [petitioner's] particular alleged circumstances is more likely than not to be tortured if imprisoned in China"). When determining a particular applicant's risk, the Convention's implementing regulations require the agency to consider "all evidence relevant to the possibility of future torture," including "[e]vidence of past torture inflicted upon the applicant." 8 C.F.R. § 1208.16(c)(3)(i); *see also Matter of H-C-R-C-*, 28 I. & N. Dec. 809, 813

30

(BIA 2024) ("[P]ast torture must be considered under 8 C.F.R. § 1208.16(c)(3)(i) in determining eligibility for protection under the CAT."). In sum, the agency must conduct an individualized assessment of the risk of torture.

This Court has reversed where the agency fails to consider an applicant's individualized risk. *See, e.g.*, *Barwari v. Mukasey*, 258 F. App'x 383, 385 (2d Cir. 2007) (Summary Order) (citing *Tambadou v. Gonzales*, 446 F.3d 298, 304 (2d Cir. 2006)) (reversing where "[t]he IJ compared Barwari—a Kurd and the wife of a former employee of U.S. government contractors who had lived in the U.S. for years …—to all other Iraqi citizens … or to Kurds who had not worked for U.S. contractors and who had not left Iraq, and concluded that she would be in the same position[]" with respect to changed country conditions evidence). Thus, whether presented with changed country conditions or not, the case law and regulations require that the Agency consider the individual's circumstances—not simply those of a broad category of people[6]—when determining the risk of torture. *See Tambadou*, 446 F.3d

---

[6] This is not to say that where an entire group of people (such as a particular ethnicity) faces a more likely than not possibility of torture, an

at 304 (emphasizing the requirement that the agency make an "individualized analysis," i.e., an analysis particular to the applicant, of all evidence in the context of changed country conditions).

Despite expressly recognizing that Mr. Ortega "belongs to a social category that makes him extremely vulnerable to violence in El Salvador[,]" the IJ found that Mr. Ortega failed to "demonstrate he will[7] be harmed rising to the level of severity constituting torture" and then proceeded to analyze Mr. Ortega's risk purely by reference to "LGBT[I+] persons" as a general population. CAR 93. In the end, the IJ found, absent any explanation as to why, that the "poor conditions" in El Salvador are insufficient "to demonstrate that it is more likely than not that *LGBT[I+] persons* will experience torture." CAR 93 (emphasis added). This generalized framing constitutes legal error.

_____

applicant of that group must always show some additional circumstance that put him at risk. Of course that is not the requirement. Instead, where an applicant belongs to an at-risk group and possesses additional risk-increasing factors, the IJ must consider those factors as well. The IJ cannot simply rest his analysis on the risk to the group-at-large.

[7] *See infra* Section IV.

For one, in utilizing this framing, the IJ completely ignores evidence of Mr. Ortega's past harm as supporting "the possibility of future torture[]"—a legal error in and of itself. *Suzhen Meng*, 770 F.3d at 1076; *see also Mu-Xing Wang*, 320 F.3d at 144 ("[T]he BIA was bound to consider any past torture inflicted upon Wang by Chinese officials.") (citing 8 C.F.R. § 1208.16(c)(3)).

Despite "assum[ing] that [Mr. Ortega] experienced past torture," CAR 92, the IJ's risk analysis notably lacks any reference to Mr. Ortega's past harms. *See* CAR 92–96. Instead, the IJ simply noted—*prior* to the risk analysis—that "no presumption of future torture arises based on this finding." CAR 92 (citing *Suzhen Meng*, 770 F.3d at 1076). This is hardly sufficient.

As the Ninth Circuit has explained, "if an individual has been tortured and has escaped to another country, it is likely that he will be tortured again if returned to the site of his prior suffering, unless circumstances or conditions have changed significantly, not just in general, but with respect to the particular individual." *Nuru v. Gonzales*, 404 F.3d 1207, 1217–18 (9th Cir. 2005). Based on such logic, the Ninth Circuit considers past torture to be "the principal factor on which [the

33

Court] rel[ies] when an applicant who has been previously tortured seeks relief under the Convention." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1080 (9th Cir. 2015) (quoting *Nuru*, 404 F.3d at 1217–18).

While not expressly recognized by this Court, Mr. Ortega's case exemplifies the soundness of the Ninth Circuit's logic. The fact that many different individuals at various times within Mr. Ortega's life *have* identified Mr. Ortega as being effeminate or queer and *have* tortured him because of this identity supports the argument clearly raised by counsel below: If returned to El Salvador, *as in the past*, Mr. Ortega will more likely than not be identified as an effeminate gay man by members of Salvadoran society in general (including the police) and more likely than not be tortured because of this identity—by individuals who tortured him in the past or by others. CAR 426 (closing argument); CAR 23–25 (BIA Brief).

This failure to properly consider Mr. Ortega's past torture is part of the larger issue of the IJ's failure to consider Mr. Ortega's particular circumstances. By analyzing only the risk to LGBTI+ individuals as a whole, the IJ ignores central aspects of Mr. Ortega's personal identity that will place him at risk. The IJ thus seemingly conducted the same

34

flawed analysis as in *Barwari*, "simply compar[ing] [Mr. Ortega] … to all other [LGBTQ+ individuals] … and conclud[ing] that []he would be in the same position." 258 F. App'x. at 385.

Mr. Ortega is not simply an "LGBT[Q+] person." CAR 93. He is an effeminate-presenting gay man who suffered decades of extreme violence because of his obvious sexuality and gender expression. *See* CAR 409–11. As Mr. Ortega credibly testified, time and time again, he was beaten because of how he looked. CAR 410. Solely because of his appearance, Mr. Ortega was perceived to be gay and subsequently tortured, the perpetrators acting without the need to confirm their suspicions of his sexuality. CAR 410 (testifying that "even though some people might not know that I am [gay], they might come to the conclusion that I am and I suffered a lot due to that in the past").

Dr. Hallett confirmed this reality, credibly testifying to the differential treatment of effeminate presenting men compared to the LGBTI+ population at large. *See* CAR 376 (explaining that women who behave in ways associated with masculinity are less at risk of violence than men who present as more "feminine"). In fact, Dr. Hallett placed Mr. Ortega's risk of harm at more than seventy percent "based

35

on . . . repeated surveys with individuals who are *somewhat similarly situated* and based on the fact that *he is not only LGBTI+* but has these other factors." CAR 385 (emphasis added). Ultimately, Mr. Ortega previously experienced and now faces such targeting most notably because of his outward effeminate presentation, regardless of his internal sexual orientation.

This distinction is key. Mr. Ortega's appearance and documented history of repeat past abuse distinguish him from the LGBTI+ population at large. CAR 376. The IJ was presented with evidence of a man whose effeminate appearance—that time and time again was recognized as gay and effeminate by gang members, police officers, and the general public—increased his risk of harm. CAR 409–11. By analyzing only the risk of torture to "LGBT[I+] person[s]" as a general population, CAR 93, the IJ failed to consider Mr. Ortega's particular and "compounded" risk, CAR 429. Instead, the IJ's analysis reduced an entire population of individuals to identical pieces of a larger whole. Such gross simplification ignores reality, humanity, and as matters here, the law. Remand is required.

### B. Rather than consider the country conditions evidence in a case-specific manner, the IJ erroneously dismissed the evidence as

**generalized in a conclusory and deficient analysis.**

The IJ separately erred by failing to view the country conditions evidence submitted by Mr. Ortega in a case-specific manner. Instead, he simply noted that "generalized evidence" is insufficient, providing no further explanation as to why Mr. Ortega's evidence was merely "generalized." CAR 93.

It is essential to recognize that reports like the Department of State Reports are, by their nature, generic reports on the status of various human rights issues present in a particular country. The fact that these reports on their own are "generic" or "generalized" does not undermine their probative value, particularly when they are viewed in a case-specific manner with the record as a whole. *See Tambadou*, 446 F.3d at 303 (remanding where the IJ failed to "use the information in the [Department of State Report] in a case-specific manner and supplement it with further analysis"); *see also Passi v. Mukasey*, 535 F.3d 98, 103 (2d Cir. 2008) (remanding where the agency failed to analyze country conditions evidence in a case-specific manner). Ultimately, country conditions reports cannot be considered in a vacuum. *See Villalta Martinez*, 157 F.4th at 115 (emphasizing the importance of considering

37

individualized risk factors in combination with other risk factors and potential sources of torture). Rather, IJs are "obligated to consider" these reports in conjunction with "the particular circumstances of the applicant's case demonstrated by testimony and other evidence." *Tambadou*, 446 F.3d at 302.

The IJ's framing of the evidence documenting abuses against LGBTI+ individuals as merely "generalized evidence of violence and crime" and "poor conditions," CAR 93, misunderstands those terms and showcases the IJ's failure to properly analyze the record evidence as a whole. *See Andrade v. Bondi*, 24-2806 at *13 (2d Cir. January 16, 2026) (Summary Order) [8] (holding that the agency "mischaracterized the record by chalking the evidence up to 'generalized reports' of ordinary police brutality"), Add. 13. Where Mr. Ortega submits evidence of "gross, flagrant or mass violations of human rights" against LGBTI+ individuals like himself to support his claim that he will be tortured because of his appearance and sexuality, such evidence *is* particularized. 8 C.F.R. § 1208.16(c)(3)(iii). Where Mr. Ortega submits evidence of his own past

---

[8] A copy of the summary order is included in the Petitioner's Addendum to the Opening Brief.

torture because of his appearance and sexuality, such evidence *is* particularized. In fact, it was the IJ's own conflation of Mr. Ortega with all LGBTI+ individuals that impermissibly generalized the scope of the analysis. And so, the sole reason provided by the IJ in dismissing Mr. Ortega's risk of harm—that "generalized evidence . . . .is insufficient"—holds no backing. CAR 93 (citing *Matter of J-G-G-*, 27 I. & N. Dec. 808, 817 (BIA 2020)). Remand, again, is required.

### C. The IJ failed to conduct an individualized analysis by ignoring the increased risk of harm associated with Mr. Ortega's sexuality in the detained context.

Despite equating Mr. Ortega to all LGBTQ+ individuals when assessing his risk in the non-detained context, the IJ failed to consider Mr. Ortega's sexuality when analyzing his risk of torture if detained. The IJ makes one reference to the fact that Mr. Ortega could be *detained* due to being gay, CAR 95 ("[A]ssuming [Mr. Ortega] is arrested and detained based on . . . his sexual orientation . . ."), but provides no analysis of how Mr. Ortega would be at *risk of torture* in prison due to being an effeminate gay male prisoner, *see* CAR 94-96. Instead, the IJ simply analyzed the risk of harm to all Salvadoran prisoners in general. CAR 95. ("[I]solated instances of torture do not create a circumstance whereby it is more likely

39

than not that any one prisoner, including [Mr. Ortega], will have harm inflicted on him rising to the level of torture"). This, again, was in error.

Mr. Ortega squarely contended that, if detained, he would face an "increased risk of torture and death" if his sexuality were discovered in prison. CAR 430. As made clear throughout his testimony, others have consistently targeted Mr. Ortega because of his clear effeminate appearance. *See*, *e.g.*, CAR 409–11.

And yet, the IJ equated Mr. Ortega to any other prisoner when dismissing his claim. *See* CAR 95. Ultimately, the IJ explained that what he dubbed "anecdotal reports of various incidents over time" were "insufficient to support a finding that it is more likely than not a person in [Mr. Ortega]'s situation will face harm in Salvadoran prisons, at the hands of security officials or inmates, that rises to the level of torture." CAR 96. This analysis mentions nothing of Mr. Ortega's "situation[.]" CAR 96. There is no mention of Mr. Ortega's appearance, his sexuality, or the IJ's previous finding that Mr. Ortega "belongs to a social category that makes him extremely vulnerable to violence[.]" CAR 93. Neither does the IJ appear to consider Dr. Hallett's testimony explaining that because "there are no special protections" for gender non-conforming

40

people like Mr. Ortega in Salvadoran prisons." CAR 378. As such, "given what [she] know[s] about violence against [LGBTI+ individuals] in the streets" Dr. Hallett inferred "it's quite extreme and severe within the prisons as well." CAR 378. Thus, in broadly addressing the country conditions reports as related to all prisoners, the IJ fails to consider the particular and heightened risk Mr. Ortega would face in Salvadoran prison as an effeminate gay man. Remand, again, is required.

## II. THE AGENCY FAILED TO ANALYZE MR. ORTEGA'S RISK OF FUTURE TORTURE IN THE AGGREGATE.

The Agency separately erred by failing to properly consider whether Mr. Ortega's aggregate risk of torture from all identified sources met the "more likely than not" standard applicable to claims under the Convention. *Villalta Martinez*, 157 F.4th at 115.

"Claims under the Convention Against Torture 'must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible . . . claims.'" *Matter of J-R-G-P-*, 27 I. & N. Dec. at 484 (quoting *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015)). The Second Circuit agrees and has remanded where this principle was not followed. *See Villalta Martinez*, 157 F.4th at 115 (remanding where the BIA failed to "consider the risk of torture in the aggregate" where it

41

"did not appear to consider" petitioner's risk from "police and other authorities because of his visible tattoos" but only considered his risk as a suspected gang member); *see also Hamilton v. Whitaker*, 759 F. App'x. 69, 71 (2d Cir. 2019) (Summary Order) (remanding where the agency failed to "consider the aggregate risk of torture").

As this Court has held, mere citation to the appropriate legal standard is insufficient. *See, e.g., Ojo v. Garland*, 25 F.4th 152, 168 (2d Cir. 2022) (remanding where "having *articulated* the two-step analysis demanded by the agency's own precedent, the IJ then *failed to conduct* a step-one analysis" (emphasis added)). Without more, this Court is left in want of analysis sufficient for appellate review. *See Poradisova*, 420 F.3d at 77 ("[W]e require a certain minimum level of analysis from the IJ and BIA[.]").

Mr. Ortega presented his risk of harm from multiple sources in both the non-detained and detained contexts. First, he will likely be detained immediately upon arrival to El Salvador "and taken to a prison where he would suffer conditions rising to the level of torture regardless of his sexuality," with an increased risk of torture and death directly at the hands of Salvadoran prison guards or fellow inmates when his sexuality

42

is discovered. CAR 429–30. Second, if not detained immediately, he faces a risk of torture from "the police, gangs[,] or members of the community" because of his sexual identity and expression, his criminal conviction and deportee status (which will render him homeless, forcing him to move from place to place), and his daughter's gang affiliations. CAR 429. Such torture would occur either outside of prison, or these factors would separately lead to Mr. Ortega's later detention and torture in prison, either by prison officials or prison inmates. CAR 429.

"Based on the conglomeration of all the evidence," Dr. Hallett articulated her professional assessment regarding Mr. Ortega's risk of torture, concluding it was "very likely." CAR 384–85; *see also* CAR 1145 (concluding in her expert report that, "[s]hould he return to El Salvador, Mr. Ortega is more likely than not to face assault, torture, or death at the hands of either the gangs or the government of El Salvador"). She further predicted that, "within a year, certainly within five years of arriving in the country, . . . [Mr. Ortega] would encounter violence rising to the level of torture . . . due to these risk factors," quantifying his overall risk of torture at "more than 70%." CAR 385.

43

In the face of this credible testimony, the IJ made four disaggregated findings. CAR 92–96. The IJ first found (1) it was not more likely than not that Mr. Ortega would be tortured "by the same individuals who have harmed him in the past because of this sexuality."[9] CAR 93. He separately found (2) it was not more likely than not that "different individuals, gang members, or government officials" will torture Mr. Ortega "because of his sexuality." CAR 93. He likewise found (3) it was not more likely than not that "different individuals and entities in El Salvador" will torture Mr. Ortega "based on his criminal deportee status and daughter's gang affiliation." CAR 93. Finally, the IJ found (4) that, if detained, "[Mr. Ortega] failed to establish that Salvadoran authorities have a specific intent to cause severe pain and suffering to [Mr. Ortega] that would more likely than not rise to the level of torture." CAR 95.

One by one by one by one, the IJ dismissed each of these theories as independently failing to meet the more likely than not threshold, with no express consideration of the overall risk presented by all theories

---

[9] Creating his own hypothetical chain under this theory, the IJ inserted duplicative steps. *See* CAR 92–96.

together. CAR 92–94. In doing so, the IJ finished his decision without conducting the requisite, holistic aggregate analysis to determine how, when taken together, the multiple risks of torture confronting Mr. Ortega interact with one another and speak to the ultimate likelihood of harm Mr. Ortega would face.

The fact that each theory did not, on its own, reach the fifty percent threshold is not dispositive. *See Velasquez-Samayoa*, 49 F.4th 1149, 1156 (9th Cir. 2022). Conducting an aggregate analysis requires more. *See Marqus v. Barr*, 968 F.3d 583, 589 (6th Cir. 2020) (citing *Shakkuri v. Barr*, 780 F. App'x 286, 291 (6th Cir. 2019)) ("An improperly disaggregated analysis would, for example, first conclude that the applicant failed to demonstrate it was more likely than not that he would be tortured by rebel forces and secondly conclude that the applicant failed to demonstrate it was more likely than not that he would be tortured by the government.").

Ultimately, the IJ's preemptory pen brush mention of the word "aggregate," CAR 91,—prior to his actual analysis—does not satisfy the legal requirement. *Ojo*, 25 F.4th at 168. Rather, it remained for the IJ to consider the theories of torture in the aggregate. *Matter of J-R-G-P-*, 27

I. & N. Dec. at 484. Where such consideration is nowhere to be found, the Board's finding that the IJ had considered Mr. Ortega's "likelihood of future torture from all sources[,]" without once mentioning, let alone conducting, the aggregate analysis, fails to rehabilitate this reversible legal error. CAR 5.

### III. THE AGENCY IMPROPERLY CONFLATED THE SPECIFIC INTENT AND PURPOSE REQUIREMENTS.

The IJ dismissed Mr. Ortega's risk of torture if detained in a Salvadoran prison by focusing solely on whether the Salvadoran government intentionally maintains the general conditions in its prisons "for the purposes of torture." CAR 95. In doing so, the IJ committed two distinct legal errors: First, he failed to properly consider Mr. Ortega's risk of torture directly at the hands of prison guards. Second, he improperly conflated the specific intent and purpose requirements as articulated by the governing regulations.

### A. The IJ failed to properly consider Mr. Ortega's risk of torture in detention directly at the hands of individual actors.

The IJ failed to properly address Mr. Ortega's likelihood of torture in detention by Salvadoran prison guards or other individual actors. Instead, he analyzed only whether the conditions in Salvadoran prisons,

in general, are intentionally created for the purpose of torturing detainees. This was in error.

The IJ's discussion of Mr. Ortega's risk of torture if detained in a Salvadoran prison frames all harm that Mr. Ortega may face under the umbrella of prison conditions. For example, the IJ noted "systematic abuse in the Salvadoran prison system, including beatings by guards, sporadic complaints of mistreatment by police, and use of electric shocks." CAR 95. He subsequently dismissed Mr. Ortega's claim, finding that "these *conditions* do not appear to be intentionally inflicted for the purposes of torture." CAR 95 (emphasis added). "Instead," the IJ elaborated, "they are secondary or tangential results of El Salvador's implementation of discipline implementing an aggressive policy to combat gang and criminal problems[.]" CAR 95. In support of this finding, the IJ exclusively references case law in the context of a government's failure to maintain adequate prison conditions. *See* CAR 95 (citing *Pierre v. Gonzales*, 502 F.3d 109, 121 (2d Cir. 2007) and *Matter of J-R-G-P-*, 27 I. & N. Dec. at 485–86 to dismiss Mr. Ortega's claim). Such an analysis misses the mark.

On one hand, Mr. Ortega's case does present the question of whether general prison conditions in El Salvador are intentionally created to torture detainees. In such cases, this Court has repeatedly held that where an applicant claims that prison conditions resulting from a government's "failure to maintain standards of diet, hygiene, and living space" themselves constitute torture, such conditions must be intentionally created and not simply "a result of poverty, neglect, or incompetence." *Pierre*, 502 F.3d at 121.

However, where an *individual* commits an act of torture against a detainee—whether through electrocution, severe beatings, rape, or murder—, CAR 95, or gang members are permitted to do the same, the question is not whether the general prison conditions were created to torture detainees on the whole but, rather, whether individual actors within the prison system would torture Mr. Ortega with the necessary specific intent. This Court has recently remanded where the agency failed to determine "based on the totality of the evidence whether the aggregate risk of torture—from prison officials *and* from harsh prison conditions— rises above [the more likely than not] threshold." *Andrade*, 24-2806 at *10 (Summary Order) (emphasis added), Add. 10.

48

To be sure, Salvadoran officials' beatings and use of electric shocks can constitute the intentional infliction of severe pain or suffering. *See Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 52 (2d Cir. 2014) (concluding "that the term 'torture' [under the Torture Victim Protection Act of 1991] can apply to powerful electric shocks administered to the body"); *see also Jean-Peirre v. United States AG*, 500 F.3d 1315, 1324 n.6 (11th Cir. 2007) ("While we deferred to the BIA's determination that '[b]eating[s] with the fists, sticks, and belts,' were not torture but rather 'lesser forms of cruel, inhuman or degrading treatment or punishment,' we were unpersuaded by the argument that such misconduct was somehow not intentional."); *Cadet v. Bulger*, 377 F.3d 1173, 1195 n.20 (11th Cir. 2004) *abrogated in part on other grounds by Loper Bright*, 603 U.S. at 412–13 ("We note that these types of physical abuse [including electric shock] in Haitian prisons are intentional acts, as opposed to inescapable results of Haiti's economic hardship."); *Matter of G-A-*, 23 I. & N. Dec. 366, 370 (BIA 2002) (describing that "[s]uch treatment [of repeated beatings], which is intentionally and deliberately inflicted on detainees by Iranian prison authorities, constitutes torture as defined in the regulations"). Similarly, the Board has emphatically

49

found that rape is torture. *Matter of H-C-R-C-*, 28 I. & N. Dec. 809, 813 (BIA 2024).

This precedent is supported by logic. One cannot intentionally electrocute another person without intentionally causing severe pain and suffering. One likewise cannot severely beat or rape another person without the necessary specific intent. Thus, the IJ's complete reliance on cases concerning a government's "failure to maintain" adequate prison conditions is misguided and ignores an important distinction raised in his briefing below: That Mr. Ortega faces specific acts of torture directly at the hands both state and non-state actors. *See* CAR 28–32. While the systematic nature of such abuses makes this consideration relevant as a part of the broader prison conditions in El Salvador, these acts, on an individual level, if inflicted against Mr. Ortega, constitute torture.

The IJ erred in failing to properly consider this claim, instead analyzing these instances of severe violence under the umbrella of country conditions. *Chen v. Gonzales*, 417 F.3d 268, 272 (2d Cir. 2005) (quoting *Mohideen v. Gonzales*, 416 F.3d 567 (7th Cir. 2005)) ("The petitioner is entitled to a reasoned analysis that engages the evidence he presented.") (cleaned up). Rather than address this argument as raised

50

by counsel below, the BIA sidestepped the proper consideration through the blanket contention that "evidence of some instances of individuals having been severely harmed or killed in detention . . . is insufficient." CAR 5. Remand is required.

## B. The IJ improperly conflated the specific intent and purpose requirements.

The IJ and BIA also committed legal errors in misapplying CAT's specific intent and purpose requirements under the regulation for Mr. Ortega's detention-based CAT claims.

Under the CAT, "[t]orture is defined as any act by which severe pain or suffering … is intentionally inflicted on a person for [an illicit] purpose[.]" 8 C.F.R. § 1208.18(a)(1). This definition can be divided into two prongs: (1) the intentional infliction of severe physical or mental pain or suffering (2) for an illicit purpose as described in the regulation. *Id.*

Regarding the first prong, this Court granted now-overruled *Chevron* deference to the Board's interpretation of "specifically intended" "to require a showing of specific intent." *Pierre*, 502 F.3d at 113 (citing *Matter of J-E-*, 23 I. & N. Dec. 291 (BIA 2002); *see* 8 C.F.R. § 1208.18(a)(5). That is, an applicant for CAT protection is required to show "that the actor intend the actual consequences of his conduct (as distinguished

from the act that causes these consequences)." *Id.* at 118; *see also* 8 C.F.R. § 1208.18(a)(5) ("An act that results in unanticipated or unintended severity of pain and suffering is not torture."). To be clear, this "specific intent" requirement attaches to the infliction of severe pain or suffering. 8 C.F.R. § 1208.18(a)(5). Thus, while the definition of torture requires the infliction of severe pain and suffering with specific intent, it does not require that the *ultimate and only purpose* of such infliction is to torture. *Id.* § 1208.18(a)(1); *cf. Acharya v. Holder*, 761 F.3d 289, 298 (2d Cir. 2014) (explaining, in the persecution context, that it is "illogical" to "presuppose[] that multiple motivations for persecution must be analyzed in competition with one another, rather than in concert"). Rather, as expressly listed in the regulation, the purpose may be to punish an individual, to intimidate an individual, "or for any reason based on discrimination of any kind." 8 C.F.R. § 1208.18(a)(1).

Against this legal backdrop, the IJ misinterpreted the regulations and held that officials must "intentionally inflict" harm "for the purposes of torture." CAR 95. This is not what "specific intent" requires. *Compare Pierre*, 503 F.3d at 116 (explaining, in the prison conditions context, that such conditions must be "created or maintained with a *specific intent to*

52

*cause severe pain and suffering*" to constitute torture) (emphasis added), *with id.* at 121 (explaining that "barbaric prison conditions might constitute torture . . . if circumstances indicate that the intent of the authorities in causing the severity of pain and suffering to illicitly discriminate, punish, coerce confessions, intimidate, or the like."). Instead, an official commits torture when he or she (1) intentionally inflicts severe pain or suffering for (2) illicit purposes. *See* 8 C.F.R. § 1208.18(a)(1).

Under this improper framework, the IJ held that where "dire prison conditions," CAR 96, "do not appear to be intentionally inflicted for the purpose[] of torture" but are instead part of an "aggressive policy" implementing "discipline" against detainees, Mr. Ortega "failed to establish that Salvadoran authorities have a specific intent to cause severe pain and suffering . . . that would more likely than not rise to the level of torture." CAR 95. This is not the standard. To the contrary, conditions intentionally created to cause severe pain or suffering for the purpose of punishment are, by definition, torture. 8 C.F.R. § 1208.18(a)(1). Thus, remand is required.

53

IV. **THE IMMIGRATION JUDGE APPLIED AN INFLATED BURDEN OF PROOF TO MR. ORTEGA'S CLAIM.**

The IJ improperly considered Mr. Ortega's personal risk of harm in the non-detained context under an inflated likelihood-of-harm standard.

The Convention Against Torture ("CAT") "expressly prohibits the United States from returning any person to a country in which it is *more likely than not* that he or she would be in danger of being subjected to torture." *Khouzam*, 361 F.3d at 168 (emphasis added) (quotation marks omitted). While the applicant bears the burden of establishing eligibility under the Convention, he need not prove "he *will* be harmed rising to the level of severity constituting torture." *Compare* CAR 93, *with* 8 C.F.R. § 1208.16(c)(2) (explaining that the applicant need only "establish that it is *more likely than not* that he or she would be tortured" (emphasis added). Neither does the law require nor reality enable a prediction with such certainty. Instead, an applicant need only "establish that there is greater than a fifty percent chance . . . that he will be tortured." *Villalta Martinez*, 157 F.4th at 114 (quoting *Chun Gao*, 424 F.3d at 128–29).

Despite this clear standard, when analyzing Mr. Ortega's risk of torture in the non-detained context, the Immigration Judge found that "while [Mr. Ortega] is extremely vulnerable to violence in El

54

Salvador . . . [the] evidence does not demonstrate he *will* be harmed rising to the level of severity constituting torture.]"  CAR 93 (emphasis added).  Such is flatly not the standard.  *See* 8 C.F.R. § 1208.16(c)(2).  Remand, again, is required. *See Chen*, 470 F.3d at 513 ("We will vacate and remand BIA decisions 'that result from flawed reasoning or the application of improper legal standards.'" (quoting *Rizal v. Gonzales*, 442 F.3d 84, 89 (2d Cir. 2006)).

## V. THE IJ'S FACTUAL FINDINGS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

The IJ's factual findings regarding Mr. Ortega's risk of future torture are not supported by substantial evidence.

Under the substantial evidence standard, "[t]he agency's 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Nasrallah*, 590 U.S. at 584 (citing 8 U.S.C. § 1252(b)(4)(B)).  This is, admittedly, a deferential standard, but here, in light of all the evidence presented, the IJ's finding that Mr. Ortega is not more likely than not to suffer torture in the future is not supported by substantial evidence. *See Hui Lin Huang v. Holder*, 677 F.3d 130, 134–35 (2d Cir. 2012) (holding that findings regarding the likelihood of future events are findings of fact).

55

Here, the IJ downplayed the severity of Mr. Ortega's past harm, ignored evidence that Mr. Ortega is easily identifiable as a gay, effeminate man in Salvadoran society, dismissed country conditions evidence as generic, and disregarded the expert witness testimony. These deficiencies in the IJ's fact-finding require remand.

### A. The IJ's finding that Mr. Ortega does not face a "more likely than not" risk of torture outside of detention is not supported by substantial evidence.

Despite expressly recognizing that Mr. Ortega "belongs to a social category that makes him extremely vulnerable to violence in El Salvador[,]" the IJ ultimately found that evidence of so-called "poor conditions" was insufficient to show that Mr. Ortega would more likely than not face torture in El Salvador. However, when the evidence is properly viewed together as a whole, the record compels a contrary conclusion. The Agency decision is thus unsupported by substantial evidence.

The IJ cherry-picked small portions of the country conditions evidence, finding the "poor conditions" insufficient to meet Mr. Ortega's burden. CAR 93. As exemplified by the evidence of record, for individuals like Mr. Ortega, conditions in El Salvador under the current State of

56

Exception cannot be described simply as "poor." *See Doe v. Sessions*, 886 F.3d 203, 211 (2d Cir. 2018) (holding that the agency errs as a matter of law where it "overlook[s] key evidence and mischaracterize[s] the record"); *see also Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009). For example, as the Stanford Migration and Asylum Lab reported in November 2023:

> Among the LGBT community in El Salvador, police brutality and failure to investigate crimes against its members are two of the most pressing concerns. It is widely recognized in El Salvador that gay and transgender people are not protected by police officers or the law, and are often abused and targeted by these same institutions. Violence against the LGBT community is pervasive in El Salvador due to a conservative and religious culture of machismo and repression. . . .
>
> LGBT individuals remain targets of homophobic and transphobic violence by police, gangs, and others in El Salvador. According to Human Rights Watch, official statistics released in January 2020 showed 692 cases of violence against LGBT people from January 2015 to June 2019. . . .

CAR 1342-43. In 2021, Human Rights Watch reported that "[b]etween January 2007 and November 2017, over 1,200 Salvadorans sought asylum in the US due to fear of persecution for their sexual orientation or gender identity." CAR 1223. "In many instances, police themselves are involved in assaulting or murdering LGBT[I+] individuals." CAR

1343. Underscoring all of this is the fact that violence against LGBTI+ individuals is severely underreported. As "[t]he human rights group Entre Amigos has reported . . . police officers often decline to file formal reports regarding attacks or abuses against gay or transgender individuals[.]" CAR 1343. As this Court has recently noted, "evidence that the Salvadoran government has limited information regarding rates of torture bolsters, rather than diminishes, the overall likelihood of torture." *Andrade*, 24-2806 at *9 (Summary Order). Pet. Add. 9.

Dr. Hallett's expert report corroborates this evidence, highlighting the lack of "accurate nationwide data" based on the Bukele administration's refusal to "cooperate with human rights monitoring mechanism[.]" CAR 1125. Even with this lapse in reporting, she explained that "violence against LGBT[I+] individuals in El Salvador is often characterized as some of the worst in the world." CAR 1123. Her report further iterated that, "[a]t the most basic level, state officials fail to protect people similarly situated to Mr. Ortega from violence because the devaluation of effeminate men's lives is embedded in cultural ideology, which becomes pervasive in state institutions and reflected in their practice." CAR 1132. "In short," she noted, "by both structural and

58

social measures, the country is in crisis[.]" CAR 1126. For people like Mr. Ortega, "[t]hese conditions are much worse[.]" CAR 1126.

Indeed, Mr. Ortega's own life in El Salvador, marked as it was by a litany of brutal attacks, sexual assault, and rape, is specific, non-generalized evidence of the widespread abuse of effeminate gay men and his risk of future torture. CAR 461 ("I do not want to return to El Salvador because my life will be at risk. I have read news articles about people being victims of discrimination, assaults, and even about people killed for being members of the LGBT community.").

In sum, Mr. Ortega's evidence clearly establishes that, in El Salvador, he faces a high risk that he will endure a life of physical assaults and sexual violence, all of which plainly constitute torture within the meaning of the CAT. *See, e.g., Matter of H-C-R-C-*, 28 I. & N. Dec. at 813.

### B. The IJ's finding that Mr. Ortega would not likely be tortured with the specific intent of the Salvadoran government if detained was not supported by substantial evidence.

The IJ's finding that Mr. Ortega would not likely be harmed with the requisite intent if detained in a Salvadoran prison likewise is not supported by substantial evidence.

This Court has held that "[t]he failure to maintain standards of diet, hygiene, and living space in prison does not" *on its own* "constitute torture under the [Convention]." *Pierre*, 502 F.3d at 121. However, this general holding does not stand where "the deficits are sufficiently extreme and are inflicted intentionally rather than as a result of poverty, neglect, or incompetence." *Id.* at 121. As this Court recently reiterated, "[b]arbaric prison conditions might constitute torture if they cause severe pain or suffering and if circumstances indicate that the intent of the authorities in causing the severity of pain and suffering . . . is to illicitly discriminate, punish, coerce confessions, intimidate, or the like." *Villalta Martinez*, 157 F.4th at 114 (emphasis added) (quoting *Pierre*, 502 F.3d at 121; 8 C.F.R. § 1208.18(a)(1). Such is the case here.

On the IJ's express findings, Salvadoran prisoners are subject to "*systematic abuse* ...*, including beatings by guards, sporadic[10] complaints of mistreatment by police, and use of electric shocks" as part of "El

---

[10] One must question the IJ's use of the word "sporadic" when housed under the umbrella of "systematic abuse." CAR 95; *see Sporadic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sporadic (last visited January 20, 2026) (defining "sporadic" as "occurring occasionally, singly, or in irregular or random instances").

60

Salvador's *implementation of discipline*" in "an aggressive policy to combat gang and criminal problems[.]" CAR 95 (emphasis added). This finding, on its face, meets the legal definition of torture.

The word "systematic" is defined as "methodical in procedure or plan" or "marked by thoroughness and regularity[.]" *Systematic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ systematic (last visited January 20, 2026). *Merriam-Webster*. Thus, the IJ expressly recognized that Salvadoran prisons are run via *systematic abuse*, i.e., abuse that is "methodical in procedure or plan" only to claim in the same stroke that such abusive conditions do "not appear to be intentionally inflicted" or are "tangential." CAR 95. This logic is, to say the very least, grossly flawed. This incongruity is repeated where the IJ finds that El Salvador's "implementation of discipline" fails to meet the definition of torture. Such "implementation of discipline" can be understood only as code for intentional punishment. CAR 95; *see Discipline*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/discipline (last visited January 20, 2026) (defining discipline as punishment). Thus, again on the IJ's own findings, the Salvadoran government has created the prison conditions for the purpose of

61

punishment. CAR 95. And yet, finds the IJ, no specific intent here. CAR 95.

The absurdity of this sentiment is further realized when considering the record as a whole. Unsurprisingly, the country conditions evidence, including the expert report and testimony, goes much further in detailing the deliberate mass atrocities committed in Salvadoran prisons than the two-sentence summary offered by the IJ.

In her report, Dr. Hallett detailed "horrific" prison conditions in El Salvador. CAR 1137. She explained that Salvadoran prisons "have been overcrowded and crumbling for decades" with no "form of rudimentary oversight or protection." CAR 1137. Such overcrowding is "a consequence of the increase in the number of detainees . . . consistent with tweets and videos published by President Bukele and other authorities that show thousands of detainees stripped to their underwear and jammed together on the floors inside prisons." CAR 1274.

In addition to intentional overcrowding, Salvadoran prison authorities deliberately neglect to provide detainees with healthcare, medicine, and food. CAR 1142. This is at the direction of higher-ranking government officials, including President Bukele himself. *See* CAR 1274

62

("President Bukele and other authorities have announced that detainees' food would be 'rationed' and they would not have access to sunlight. . . . [He later] threatened to deny all prisoners food if the spike in murder in the country continued, an action that would amount to collective punishment prohibited under international human rights law.").

As Dr. Hallett clearly explained, "the *systematic practice of torture* inside [Salvadoran] prisons" is well-documented. *Compare* CAR 1142 (emphasis added) with CAR 95 (IJ Decision) (noting only "systematic *abuse*" with general reference to the country conditions filed by Mr. Ortega in 2024) (emphasis added). She further elaborated that the excessive deaths of detainees are "the result of torture and serious systematic injuries." CAR 1142. Ultimately, these torturous conditions are intentional, reflecting the Salvadoran government's policies under the current "state of emergency," which operates "with even greater levels of abuse and *punitive intent*" than seen previously. CAR 1143 (emphasis added); *see also* CAR 1259 (noting that President Bukele ordered prison authorities to keep cells closed 24 hours per day, tweeting, 'Nobody is allowed out, not even to the patio,' . . . while also sending 'a

63

message to the gangs,' suggesting that the *detainees were being punished for the conduct of gang members* outside of prison[]") (emphasis added).

This Court is well acquainted with these conditions. In *Villalta Martinez*, the respondent submitted evidence the Second Circuit found supported the finding that "the government [of El Salvador] intentionally subjects detainees to overcrowding and starvation within the prisons." 157 F.4th at 116. Mr. Ortega appears to have submitted some of the very same evidence relied on by this Court to reach that conclusion and hold that the Agency erred in describing evidence of torture as merely anecdotal. *Compare id.* at 116 (citing to the 2022 Human Right Watch Report, which reports that "the circumstances of many deaths in custody during the state of emergency suggest state responsibility for those deaths. . . . [H]uman rights violations were not isolated incidents by rogue agents. Rather, similar violations were carried out repeatedly and across the country, throughout a period of several months, by both the military and the police.") *with* CAR 1226-27 (same). In addition, the more recent reports relied on by Mr. Ortega likewise contain evidence of social media posts by Salvadoran officials advertising the severe overcrowding in prisons, *see* CAR 1274, and tweets by President Bukele severely

64

rationing food and ordering that prisoners "do not see sunlight[.]" *Compare Villalta Martinez*, 157 F.4th at 116 *with* CAR 1274, 1259. Such reports showcase "that these conditions are intentionally inflicted[.]" *Villalta Martinez*, 157 F.4th at 116.

Thus, as in *Villalta Martinez*, it is clear that the "intent of the authorities" in El Salvador is to "punish" those imprisoned and "intimidate" gang members by means of horrific prison conditions. *Id.* at 114; *see also Andrade*, 24-2806 at \*11–12 (Summary Order) (explaining that evidence of the Salvadoran government advertising "prisoners held shoulder-to-shoulder "as what the gang member deserve . . . constitutes some evidence that overcrowding was intentional punishment"), Add. 11–12. What is unclear, then, is how, on the facts of record *and the IJ's own findings*, the IJ could possibly reason otherwise.

The BIA fails to provide the necessary clarity. Leaning on the oft-cited *Pierre* progeny (i.e., the "failure to maintain prison conditions" line of case law), the Board reiterates the IJ's reasoning that "intentional detention in substandard facilities does not constitute torture *unless* the evidence demonstrates that poor or life-threatening prison conditions are intentionally and deliberately created and maintained by authorities to

65

intentionally inflict severe pain or suffering." CAR 5 (emphasis added) (citing *Matter of A-A-R-*, 29 I. & N. Dec. at 43;[11] *Matter of J-E-*, 23 I. & N. Dec. at 301; *Pierre*, 502 F.3d at 116–22; *Matter of J-R-G-P-*, 27 I. & N. Dec. at 485).

The problem here is that the Board, like the IJ, ignores the very important "*unless*." CAR 5 (citing *Matter of A-A-R-*, 29 I. & N. Dec. at 43). Substandard prison conditions cannot constitute torture *unless* the conditions are deliberately created or maintained. *Pierre*, 502 F.3d at 111.

In Matter *of J-E-*, the IJ expressly noted "there [was] *no evidence* that [Haitian authorities] [were] intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." 23 I. & N. Dec. at 301 (emphasis added). Instead, the prison conditions were "the result of budgetary and management problems as well as the country's severe economic difficulties." *Id.* In *Pierre*, the IJ had found that "the poor conditions result[ed] *chiefly from the economic situation* in

---

[11] This case has been seriously called into question by *Villalta Martinez*, which found that country conditions evidence documenting hundreds of murders in Salvadoran prisons was "contrary to the BIA's conclusion that such reports of torture are anecdotal." 157 F.4th at 116.

Haiti" rather than "intent to cause severe suffering through harsh conditions as an additional means of intimidation." 502 F.3d at 121 (emphasis added). In *Matter of J-R-G-P-*, the IJ noted record evidence showing the Mexican government's *efforts to improve* detention facility conditions, finding that any harm the respondent may suffer in state facilities "will more likely that not *result from a lack of resources, training, education, or negligence*—rather than acts specifically intended to inflict severe pain or suffering upon the respondent." 27 I. & N. Dec. at 486 (emphasis added). In each of these cases, the clause following the "unless" had not been established.

In contrast, the conditions in Salvadoran prisons are not the simple result of a "failure to maintain standards of diet, hygiene, and living space," *Pierre*, 502 F.3d at 121, and Mr. Ortega's case is in no way analogous to those presented in *Matter of J-E-*, *Pierre*, or *Matter of J-R-G-P-*. Here, the IJ made no express findings regarding the Salvadoran government's lack of resources or inability to maintain its facilities. *Compare Matter of J-E-*, 23 I. & N. at 301 *with* CAR 94–96. He made no findings of improved conditions. *Compare Matter of J-R-G-P-*, 27 I. & N. at 485 *with* CAR 94–96. He did not find an absence of evidence showing

67

the intentional infliction of severe pain and suffering. *Compare Matter of J-E-*, 23 I. & N. Dec. at 301 *with* CAR 94–96. Instead, the IJ found that the conditions in Salvadoran prisons are an express component of El Salvador's "implementation of discipline." CAR 95. In short, torture is the point. Even without the overwhelming evidence of record showcasing such, on the IJ's own words, this Court must reverse.

## CONCLUSION

For the foregoing reasons, Mr. Ortega respectfully requests that this Court grant his Petition for Review, vacate the Board's order below, and remand this case back to the Board with instructions to conduct additional analysis under the appropriate legal standard and remand the Immigration Court for additional fact-finding as necessary.

Respectfully Submitted,

*/s/ Kerry Q. Battenfeld*

Kerry Q. Battenfeld
Coryn R. Johnson
Jillian E. Nowak
Jhoanna F. Sylio
PRISONERS' LEGAL SERVICES OF NEW
    YORK
14 Lafayette Sq., Ste. 510
Buffalo, NY 14203
(716) 844–8266
kbattenfeld@plsny.org
*Counsel for Petitioner*

68

Dated:        January 20, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 13,985 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief further complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) because it has been prepared using 14-point Century Schoolbook font in Microsoft Word.

//

*/s/ Kerry Q. Battenfeld*
Kerry Q. Battenfeld

Dated:      January 20, 2026

70

## CERTIFICATE OF SERVICE

I, Kerry Q. Battenfeld, certify that on January 20, 2026, I electronically filed the foregoing Petitioner's Opening Brief via this Court's ACMS system, which will send notice of such filing to counsel of record in the above-captioned case.

//

/s/ Kerry Q. Battenfeld
Kerry Q. Battenfeld

Dated:      January 20, 2026