# No. 25-1581

———————————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————————————

**MANUEL DE JESUS ORTEGA,**
**AGENCY NO. 094-750-855,**
**Petitioner,**

v.

**TODD BLANCHE,**
**ACTING UNITED STATES ATTORNEY GENERAL,**
**Respondent.**

———————————————————

## PETITION FOR REVIEW OF AN ORDER OF
## THE BOARD OF IMMIGRATION APPEALS

———————————————————

## BRIEF FOR RESPONDENT

———————————————————

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

**BERNARD A. JOSEPH**
Senior Litigation Counsel

**ENITAN O. OTUNLA**
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-9517

Attorneys for Respondent

## STATEMENT REGARDING ORAL ARGUMENT

Respondent believes that oral argument is unnecessary in this case.  The briefs and record adequately present the facts and legal arguments.  Should the Court consider oral argument appropriate, counsel for Respondent requests an amount of time equal to that afforded to Petitioner.

*/s/ Enitan O. Otunla*
ENITAN O. OTUNLA
Trial Attorney
Office of Immigration Litigation
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 598-9517

April 21, 2026

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION..................................................................................1

RESTATEMENT OF THE ISSUE....................................................................................2

STATEMENT OF THE CASE AND THE RELEVANT FACTS ..........................3

    I.   Mr. Ortega's Unlawful Entries To The United States; His Multiple Convictions For Driving While Intoxicated; The DHS's Initiation Of Proceedings And His Grant Of Withholding......................................................3

    II.  Mr. Ortega's Conviction For The Offense Of Rape Of A Minor, And The DHS's Successful Motion To Reopen Proceedings And Terminate His Prior Grant Of Statutory Withholding Of Removal ..................................................5

    III. In Reopened Removal Proceedings, Mr. Ortega Applies For CAT Deferral Of Removal Based On Updating His Prior Claim...........................................6

    IV. Mr. Ortega's Relief And Protection Claims .......................................................6

    V.  Mr. Ortega's Relevant Supporting Evidence..................................................14

    VI. IJ's December 24, 2024 Denial Of Mr. Ortega's Application ......................15

    VII.The Board Affirms The IJ's Denial Of CAT Deferral...............................18

SUMMARY OF THE ARGUMENT ....................................................................20

ARGUMENT .............................................................................................................21

    I.   Standard And Scope Of Review..................................................................21

    II.  Applicable Law And Burden Of Proof - CAT Deferral..............................22

    III.  Mr. Ortega Has Failed To Establish That The Record Compels The Conclusion That He Is Eligible For CAT Deferral. .....................................24

        A.  Mr. Ortega Failed To Show That Someone In His Circumstances Would Likely Face Torture.............................................................................25

i

B.  The Agency Specifically Considered That Mr. Ortega Was  Last Harmed As A Child/Young Adult Twenty Years Ago..............................................38

C.  Mr. Ortega Failed To Administratively Exhaust His Claim  That The Agency Did Not Analyze His Risk Of Future  Torture In The Detained Context ..................................................................................42

D.  Mr. Ortega Also Failed To Administratively Exhaust His  Claims That The Agency Did Not Analyze His Risk Of  Future Torture In The Aggregate, And Applied An Inflated  Burden Of Proof To His Claim.....45

E.  The Court Should Reject Mr. Ortega's Remaining  Arguments................46

CONCLUSION.......................................................................................................52

BRIEF IN PAPER FORMAT CERTIFICATION

CERTIFICATE OF SERVICE

ii

## TABLE OF AUTHORITIES

## CASES

*American Textile Mfrs. Inst., Inc., v. Donovan*,
452 U.S. 490 (1981)..........................................................................................22

*Andrade v. Bondi*,
2026 WL 125260 (2d Cir. Jan. 26, 2026) ..........................................................50

*Banegas Gomez v. Barr*,
922 F.3d 101 (2d Cir. 2019)..............................................................................51

*Barwari v. Mukasey*,
258 F. App'x 383 (2d Cir. 2007) .......................................................................39

*Bhagtana v. Garland*,
93 F.4th 592 (2d Cir. 2023) ..............................................................................37

*Chen v. BIA*,
435 F.3d 141 (2d Cir. 2006)..............................................................................21

*Chen v. U.S. Dep't of Justice*,
471 F.3d 315 (2d Cir. 2006)..............................................................................44

*Chun Gao v. Gonzales*,
424 F.3d 122 (2d Cir. 2005)................................................................. 23, 31, 33

*Consolo v. FMC*,
383 U.S. 607 (1966)................................................................................. 22, 29

*Cooper v. Harris*,
581 U.S. 285 (2017)..........................................................................................19

*Doe v. Sessions*,
886 F.3d 203 (2d Cir. 2018)..............................................................................28

*Garland v. Ming Dai*,
  593 U.S. 357 (2021)........................................................................... 21, 37, 52

*Huang v. Garland*,
  2024 WL 4691005 (2d Cir. 2024) ......................................................41

*INS v. Bagamasbad*,
  429 U.S. 24 (1976)..............................................................................17

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992).............................................................................21

*Jagdeep Singh v. Garland*,
  11 F.4th 106 (2d Cir. 2021) ...............................................................22

*Jian Hui Shao v. Mukasey,*
  546 F.3d 138 (2d Cir. 2008)................................................................44

*Jian Xing Huang v. U.S. INS*,
  421 F.3d 125 (2d Cir. 2005)................................................................25

*Joaquin-Porras v. Gonzales*,
  435 F.3d 172 (2d Cir. 2006)......................................................... 22, 30

*Loka-Sacasari v. Garland*,
  2024 WL 3948995 (2d Cir. 2024) ......................................................26

*Manning v. Barr*,
  954 F.3d 477 (2d Cir. 2020)......................................................... 21, 51

*Mbendeke v. Garland*,
  860 F. App'x. 191 (2d Cir. 2021) .......................................................41

*Mu Xiang Lin v. U.S. Dept of Just.*,
  432 F.3d 156 (2d Cir. 2005)............................................... 19, *passim*

*Nethagani v. Mukasey*,
  532 F.3d 150 (2d Cir. 2008).................................................................5

*Nuru v. Gonzales*,
  404 F.3d 1207 (9th Cir. 2005) ................................................................39

*Ojo v. Garland,*
  25 F.4th 152 (2d Cir. 2022) ..................................................................44

*Pierre v. Gonzales*,
  502 F.3d 109 (2d Cir. 2007)................................................... 36, 47, 51

*Punin v. Garland*,
  108 F.4th 114 (2d Cir. 2024) ........................................................ 43, 45

*Quintanilla-Mejia v. Garland*,
  3 F.4th 569 (2d Cir. 2021) ........................................................... 29, 51

*Santos-Zacaria v. Garland*,
  598 U.S. 411 (2023)...................................................................... 43, 45

*Savchuck v. Mukasey*,
  518 F.3d 119 (2d Cir. 2008)......................................................... 24, 25

*Suzhen Meng v. Holder*,
  770 F.3d 1071 (2d Cir 2014)................................................... 19, 41, 42

*Ud Din v. Garland*,
  72 F.4th 411 (2d Cir. 2023) ...................................................................45

*Villalta Martinez v. Bondi*,
  157 F.4th 108 (2d Cir. 2025) ....................................................... 36, 37

*Wang v. Ashcroft*,
  320 F.3d 130 (2d Cir. 2003)...................................................................20

*Yan Chen v. Gonzales*,
  417 F.3d 268 (2d Cir. 2005)...................................................................31

*Zelaya-Moreno v. Wilkinson*,
  989 F.3d 190 (2d Cir. 2021)......................................................... 41, 42

v

## ADMINISTRATIVE DECISIONS

*Matter of A-A-R-,*
   29 I. & N. Dec. 38 (BIA 2025) ....................................................... 20, 49, 50

*Matter of Burbano*,
   20 I. & N. Dec. 872 (BIA 1994) ................................................................19

*Matter of D-R-,*
   25 I. & N. Dec. 445 (BIA 2011) ................................................................19

*Matter of H-C-R-C-,*
   28 I. & N. Dec. 809 (BIA 2024) ................................................................38

*Matter of J-E-,*
   23 I. & N. Dec. 291 (BIA 2002) ......................................................... 23, 39, 48

*Matter of J-F-F-,*
   23 I. & N. Dec. 912 (BIA 2006) ......................................................... 15, 24, 26

*Matter of J-J-G-,*
   27 I. & N. Dec. 808 (BIA 2020) .............................................................. 16, 28

*Matter of J-R-G-P-,*
   27 I. & N. Dec. 482 (BIA 2018) ........................................................... 18, 47, 48

*Matter of M-A-M-Z-,*
   28 I. & N. Dec. 173 (BIA 2020) ................................................................16

*Matter of N-A-M-,*
   24 I. & N. Dec. 336 (BIA 2007) ..............................................................5, 19

*Matter of R-S-H-,*
   23 I. & N. Dec. 629 (BIA 2003) ................................................................19

## <u>STATUTES</u>

Immigration and Nationality Act of 1952, as amended

Section 208(b)(2)(B)(i),
  8 U.S.C. § 1182(b)(2)(B)(i) ....................................................................5

Section 212(a)(6)(A)(i),
  8 U.S.C. § 1182(a)(6)(A)(i) ....................................................................4

Section 241(b)(3)(B),
  8 U.S.C. § 1231(b)(3)(B) ........................................................................5

Sectiopn 242,
  8 U.S.C. § 1252 ......................................................................................2

Section 242(b)(1),
  8 U.S.C. § 1252(b)(1) ............................................................................2

Section 242(b)(2),
  8 U.S.C. § 1252(b)(2) ............................................................................2

Section 242(b)(4)(B),
  8 U.S.C. § 1252(b)(4)(B) ......................................................................21

Section 242(d)(1),
  8 U.S.C. § 1252(d)(1) ............................................................................43

## New York State Penal Law ("NYSPL")

Section 130.25(2) ............................................................................ 5, 19, 22

## New York State Vehicle and Traffic Law ("VTL")

Section 511.3-03 ....................................................................................3

 Section 1192-02 ....................................................................................3

Section 1192-2- AA ...............................................................................3

## **REGULATIONS**

8 C.F.R. § 208.16(c).............................................................................22

8 C.F.R. § 208.17(a).............................................................................22

8 C.F.R. § 1003.1 ................................................................................2

8 C.F.R. § 1003.2(c)(1).........................................................................25

8 C.F.R. § 1208.16(c)(1).......................................................................15

8 C.F.R. § 1208.16(c)(2)............................................................. 15, 22, 40

8 C.F.R. § 1208.16(c)(3)................................................................. 40, 41

8 C.F.R. § 1208.16(c)(3)(iv)...................................................................23

8 C.F.R. § 1208.17(a)...........................................................................22

8 C.F.R. § 1208.18(a)...........................................................................32

8 C.F.R. § 1208.18(a)(2).......................................................................23

8 C.F.R. § 1208.18(a)(3).......................................................................35

8 C.F.R. § 1240.15 ..............................................................................2

# No. 25-1581

—————————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

—————————————————————————

**MANUEL DE JESUS ORTEGA,
AGENCY NO. 094-750-855,
Petitioner,**

**v.**

**TODD BLANCHE,
ACTING UNITED STATES ATTORNEY GENERAL,
Respondent.**

—————————————————————————

**PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS**

—————————————————————————

## STATEMENT OF JURISDICTION

In this immigration case, petitioner Manuel de Jesus Ortega ("Mr. Ortega"), a native and citizen of El Salvador, seeks review of a June 11, 2025 order of the Board of Immigration Appeals ("Board"). *See* Certified Administrative Record ("AR") 3-6. In its decision, the Board dismissed Mr. Ortega's appeal from an Immigration Judge's ("IJ") December 20, 2024

denial of his request for deferral of removal under the regulations implementing the Convention Against Torture ("CAT"). AR 3-6, 82-96.

The Board's jurisdiction arose under 8 C.F.R. §§ 1003.1 and 1240.15, granting it jurisdiction over the decisions of IJs in removal cases. This Court has jurisdiction to review the Board's final order under 8 U.S.C. § 1252, which confers exclusive jurisdiction on the courts of appeals to review final orders of removal. This petition for review is timely, as it was filed on June 25, 2025, within thirty days of the Board's final order. *See* 8 U.S.C. § 1252(b)(1); Fed. R. App. P. 26(a)(1)(C). Venue properly lies in this Court, as removal proceedings were completed in Batavia, New York. AR 82-96; 8 U.S.C. § 1252(b)(2).

## RESTATEMENT OF THE ISSUE

Whether the Court should affirm the agency's denial of CAT deferral, where the evidence does not compel the conclusion that Mr. Ortega met his burden of establishing a clear probability of an individualized risk of future torture in El Salvador.

2

## STATEMENT OF THE CASE AND THE RELEVANT FACTS

**I.  Mr. Ortega's Unlawful Entries To The United States; His Multiple Convictions For Driving While Intoxicated; The DHS's Initiation Of Proceedings And His Grant Of Withholding**

Mr. Ortega first entered the United States on or about February 9, 2001, at or near San Diego, California, without inspection, admission, or parole.  *See* AR 877, 1084.  On October 12, 2007, Mr. Ortega was convicted for the offenses of driving while intoxicated ("DWI") in violation of New York State Vehicle and Traffic Law ("VTL") § 1192-02; aggravated unlicensed operation of a motor vehicle in the third degree in violation of VTL § 511.3-03 and aggravated unlicensed operation of a motor vehicle in the first degree while under permanent revocation, in violation of VTL § 511.3-03.  AR 749-50.  He was sentenced to imprisonment, fines and fees, and his driver's license was revoked.  AR 566.

The Department of Homeland Security ("DHS") initiated removal proceedings; Mr. Ortega waived all applications for relief and accepted voluntary departure in January 2008.  AR 188, 281-82, 290, 460, 1120.

Mr. Ortega unlawfully reentered the United States on or about February 2008.  AR 112, 877.  After his reentry, Mr. Ortega was convicted for the offense of an aggravated DWI in violation of VTL § 1192-2-AA on May 28, 2018.  AR 83, 748-49, 1088.

3

On May 31, 2018, the DHS again initiated proceedings against Mr. Ortega by filing a Notice to Appear ("NTA") with the immigration court. AR 1638-40. The NTA charged Mr. Ortega with removability under 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present without admission or parole. AR 1638. On January 31, 2019, Mr. Ortega, appearing pro se, admitted the factual allegations in the NTA. AR 111-12. Based on his admission, the IJ sustained Mr. Ortega's removability as charged in the NTA. AR 83, 112. His proceedings were continued for him to retain counsel. AR 121-33.

As relief from removal, Mr. Ortega was granted statutory withholding of removal on July 9, 2019, based on his claim of persecution in El Salvador on account of his sexual orientation. AR 877-88 (application), 889-1066 (evidence, including Mr. Ortega's declaration, supporting affidavits and country conditions), 1565. The IJ found Mr. Ortega testified credibly, suffered past persecution and established a well-founded fear of persecution "based on the extensive country conditions evidence that show that LGTBQ individuals are highly stigmatized, discriminated against and suffer acts of violence and other abuses by police, security forces, gang members and the community at large." AR 293-94.

**II.  Mr. Ortega's Conviction For The Offense Of Rape Of A Minor, And The DHS's Successful Motion To Reopen Proceedings And Terminate His Prior Grant Of Statutory Withholding Of Removal**

On August 29, 2022, Mr. Ortega was convicted for the offense of rape in the third-degree, in violation of New York State Penal Law ("NYSPL") § 130.25(2) and sentenced to two years imprisonment and four years of post-release supervision.  AR 1560-64; *but see* AR 417-18.  The DHS moved to reopen immigration proceedings and terminate Mr. Ortega's prior grant of statutory withholding of removal based on his recent conviction.  *Id*. (arguing that under 8 U.S.C. § 1158(b)(2)(B)(i), Mr. Ortega's conviction is a particularly serious crime).  In reopened removal proceedings, the IJ granted the DHS's motion and terminated Mr. Ortega's prior grant of statutory withholding of removal on September 6, 2024.  AR 1550-52[1] (finding, upon review of the elements of the statute and the DHS's submission of evidence showing his initial charge involving a victim under the age of 15, that Mr. Ortega's conviction in violation of NYSPL § 130.25(2) is a "particularly serious crime" and citing *inter alia*, *Nethagani v. Mukasey*, 532 F.3d 150, 155 (2d Cir. 2008); *Matter of N-A-M-,* 24 I. & N. Dec. 336, 342 (BIA

---

[1]  Mr. Ortega does not challenge the agency's determination that his conviction for the offense of rape in the third-degree in violation of NYSPL § 130.25(2) is a particularly serious crime barring him from asylum and withholding of removal.  *See generally* Petitioner's Opening Brief at 23-68; 8 U.S.C. § 1158(b)(2)(B)(i); 8 U.S.C. § 1231(b)(3)(B).

2007)). The parties agreed that Mr. Ortega was eligible to apply for only CAT deferral. AR 304.

### III. In Reopened Removal Proceedings, Mr. Ortega Applies For CAT Deferral Of Removal Based On Updating His Prior Claim

At the commencement of the merits hearing in his reopened removal proceedings on October 15, 2024, Mr. Ortega, through counsel, indicated his intention to rely on updated evidence and his original asylum application, with necessary amendments. AR 352, 877-88 (original application), 1153-1534 (updated country conditions). Both parties agreed to incorporate Mr. Ortega's testimony from his prior hearings as evidence in these proceedings. AR 344-45, 352. That same day, Mr. Ortega testified and presented Dr. Miranda Hallett ("Dr. Hallett"), Director of Human Rights Studies and an Associate Professor of Cultural Anthropology, as an expert witness on gang violence, government corruption, and the State of Exception.[2] AR 358-423.

### IV. Mr. Ortega's Relief And Protection Claims

Mr. Ortega was born in Dulce Nombre, Octal Village, Chalatenango, El Salvador. AR 453, 977. He has a total of five (now adult) children from two different women. AR 455, 878 and 887 (listing his children, including a

---

[2] The State of Exception, enacted in March 2022, is a national law of El Salvador under which known or suspected gang members may be arrested and imprisoned. *See* AR 1165 (USDOS Report).

6

son named Jose Manuel Ortega Mendez ("Jose") and a daughter named Fidelina del Carmen Ortega Mendez ("Fidelina")). He described his childhood and young adulthood marked by verbal, physical or sexual violence from his family, peers, and others because of his sexual orientation. AR 165-69, 172-82, 416, 453-55.

For instance, Mr. Ortega testified that he was molested and raped as a child by a man named Virgilio, who bought liquor from Mr. Ortega's father's business and who was allowed to share Mr. Ortega's bed when he was intoxicated. AR 165-66. When Mr. Ortega told his mother about Virgilio's abuse, she slapped and hit him with a belt because she did not believe him. AR 165, 453. When Mr. Ortega was seven years old, which would have been in about 1967, he was frequently physically assaulted and called homophobic slurs by a woman named Yana. AR 164, 454. When he was about ten years old, Mr. Ortega was beaten and called derogatory slurs by neighbors who found him kissing a boy. AR 167. As a result, his parents sent him away to a coffee farm for fifteen days with two men named Santiago and Julio. AR 166-67, 454. Santiago and Julio threatened to kill Mr. Ortego unless he had sex with Julio; when he refused, Mr. Ortego was beaten, locked up and raped by Julio for eight days. AR 168, 454.

7

Mr. Ortega was physically assaulted and called derogatory slurs by unidentified men in 1986 when he lived in Chalchuapa, Santa Ana, and in 1989 when he lived in El Pinalito, Santa Ana, because of his sexual orientation. AR 169, 170-71, 454-55. As a result of the latter incident, Mr. Ortega underwent surgery. AR 172, 455. Mr. Ortega did not report this incident to the authorities because he was afraid of his attackers. *Id*.

In 1990, after the rejection of his army application, Mr. Ortega worked as a military guard in El Pinalito. AR 175-76, 455. One night, the military commander struck Mr. Ortega in his back, and punched and ridiculed him. AR 456. Mr. Ortega punched the commander in self-defense and suffered a broken nose when a man named Francisco protected the commander. *Id*. The next day, as Mr. Ortega left El Pinalito, he encountered Francisco who reached for a gun, but Mr. Ortego shot Francisco first. AR 182, 457. Although Francisco survived the gunshot, the commander offered a reward for Mr. Ortego's death. *Id*.

As another example of his abuse, Mr. Ortega said he was physically assaulted and insulted upon his return to El Pinalito some years later by the same group of men who beat him in 1989. AR 172-73, 457. One of the men cut him with a sharp blade, necessitating medical treatment. *Id*. Mr. Ortega said the police refused help, saying they did not defend gay men. AR 457.

8

In 2000, Mr. Ortega was harassed by a person wielding a gun. AR 458. He said the man who cut his hand in 1989 and beat him a few years afterwards in El Pinalito visited his home with a pistol and wanted to kill him because of his sexual orientation. *Id*. This man fired a shot into the air while yelling obscenities. *Id*. Mr. Ortega went to the authorities to report the incident and the people at the municipal office laughed and said that if he were a man, Mr. Ortega would kill this person himself. *Id*. Mr. Ortega relocated again to Santa Ana and was frequently harassed by gang members who used homophobic insults and slurs. *Id*. In 2008, shortly after returning to El Salvador after accepting voluntary departure, Mr. Ortega was chased by a man who cut him in the leg with a machete. AR 188, 460.

Despite acknowledging that he had spoken to no one in El Salvador for the last three years, Mr. Ortega fears that people would recognize him based on his prior experiences and history and his family's knowledge of his sexual orientation. AR 410-411. When asked who knew about his sexual orientation in El Salvador, Mr. Ortega listed his father, two of his daughters, and the individuals who he previously had problems with. AR 410, 421. Mr. Ortega indicated his belief that people would conclude that he is bisexual because he cannot hide his behavior and identity. AR 411.

Mr. Ortega said that, as of 2019, he has been threatened and attacked in prison in the United States by inmates because of his sexual orientation. AR 411-12. Mr. Ortega confirmed that his ex-romantic partner in El Salvador told their daughter (named Fidelina) that he is bisexual, and they both taunt him because of his sexual orientation. AR 1546. He said that Fidelina has two children with members of the Mara Salvatrucha 13 ("MS-13") gang and has extorted him in the past. AR 413-14. Mr. Ortega previously sent Fidelina money three times. AR 414. When he refused to send her more money, Fidelina used a homophobic slur and threatened to harm Mr. Ortega if he returned to El Salvador. *Id*. Also, one of his sons in El Salvador (named Jose) was attacked by gang members for passing through the area they controlled; but Mr. Ortega indicated his belief that the attack was because of Mr. Ortega's sexual orientation. AR 414-15, 419. He indicated his belief that the police would not protect him in El Salvador. AR 416. Mr. Ortega claims a fear of removal to El Salvador and torture either in or outside of prison by the police, gangs, or members of the community because of his criminal deportee status and sexual orientation. AR 429-30.

Dr. Hallett testified that former public officials in El Salvador have told her about collusion or corruption between the government and non-state actors, even during the current State of Exception. AR 369-70, 379, 394.

10

She described the "major crackdown on gangs," during the State of Exception and "enact[ment of] rather extreme measures or suspen[sion of] rather basis human rights protections." AR 370. She said the government has arrested "over 70,000" Salvadorans that are "not only gang members or people who have connections to gangs, but also people who are otherwise seen as undesirable by the police or by the Salvadoran state." AR 371. She said that a gay effeminate man like Mr. Ortega is "definitely stigmatized and considered part of an undesirable group by the vast majority of Salvadoran society." *Id*. She explained that she derived her opinions from working closely with certain Salvadoran human rights organizations, including Cristosal, and friends and colleagues of members of the LGBTI+ community. AR 372. She claimed gender-based violence in El Salvador "has grown by four times" and "it's the police themselves who, [sic] gender-nonconforming individuals might fear the violence from." AR 375, 376.

Referring to prison conditions in the 2000's, Dr. Hallett described them as "warehouses" with "open pits in the floor with [sic] human waste in them with no ability to flush it away" and "substandard food or inmates who appeared to be severely malnourished due to lack of food, and [sic] outbreaks of infectious disease." AR 377. She described "a few brand new facilities that have been built by the Bukele administration" and that

11

overcrowding is "more extreme in the vast majority of facilities." *Id*. She said there were "no special protections" for gender non-conforming individuals who face "violence from the general population" and "quite extreme and severe [violence] within the prisons as well." AR 378.

Despite the State of Exception, she said gangs continued to operate. AR 378-79. She said citizens report anyone for suspicion of gang affiliation with "very flimsy [sic] evidence" to the police, who have arrest quotas to meet. AR 381-82. She said Mr. Ortega's daughter's affiliation with MS-13 elevates his risk of harm, particularly as animosity exists between them. AR 382. She described the repatriation of gang members to El Salvador. AR 383-84, 388-89. She stated that gang members are screened at the airport for a "delinquency profile," which includes a criminal record. AR 460. She said she spoke with several criminal deportees who were immediately detained and interrogated at the airport, and in some cases tortured. AR 383. She said that those deportees with a criminal record are required to report to a local courthouse on a routine basis and sometimes restricted regarding their place of residence and employment. AR 384. Based on his past experiences and the evidence, Dr. Hallett concluded that "within a year, certainly within five years of arriving in the country, [Mr. Ortega] would

12

encounter violence rising to the level of torture, um, due to these risk factors." AR 385. She placed his risk of harm at "more than 70%." *Id.*

Dr. Hallett's expert witness affidavit said that the Mara Salvatrucha 13 and 18th Street gangs control much of society in El Salvador through terror. AR 1122, 1128-29, 1133. She explained that they take "advantage of a weak state and fragmented rule of law" to build "coordinated campaigns to profit from the control and regulation of specific neighborhoods in their core territories." *Id.*; *see also* AR 1130-31. Dr. Hallett claimed the "Salvadoran state is [] the primary abuser of human rights in the country" as evidenced by the "mass roundups and arbitrary detention of over 75,000 Salvadorans, many of whom have no ties to gangs." AR 1222, 1134, 1143. She criticized the efficacy of the State of Exception, saying that "[u]nder the suspension of due process and other procedural protections from March 2022 forward, police abuse and extrajudicial violence have now outstripped gang violence as the primary source of internal displacement." AR 1125, 1137-38 (saying 30 to 50 detainees were held in 12x15 cages designed to hold less than 10 detainees on a temporary basis of less than 72 hours; explaining the lack of sanitation caused outbreaks of scabies, pneumonia and tuberculosis), 1139-42 (saying that President Bukele was accused of collaborating with illicit organizations). She concluded that "conditions have changed markedly in El

13

Salvador in ways that increase [Mr. Ortega's] risk of assault, torture or death." AR 1144.

## V. Mr. Ortega's Relevant Supporting Evidence

The following were among the exhibits that Mr. Ortega submitted in support of his application for CAT deferral of removal:

(1) his amended declaration, dated June 25, 2019, AR 453-461;

(2) his expert witness affidavit by Dr. Hallett describing prison conditions prior to and since the ongoing State of Exception in El Salvador and opinion on his risk of torture,[3] AR 1114-47;

(3) Country Reports on Human Rights Practices for 2023 published by the United States Department of Justice ("USDOS Report"), AR 1163-1206;

(4) *El Salvador Events of 2023* published by Human Rights Watch ("HRW article"), AR 1208-15;

(5) *We can Arrest Anyone We Want* published by Human Rights Watch ("HRW Summary"), AR 1226-87;

(6) *El Salvador: The Institutionalization of Human Rights Violations After Two Years of Emergency Rule*" published by Amnesty International. AR 1218-20.

---

[3] While her affidavit opined on Mr. Ortega's risk of torture upon removal to El Salvador, it also included a reference to the "risks faced by *Jacobo Ortega-Fuentes*." AR 1120 (emphasis added), 1541 (explaining her "mistaken" and "typographical error" to this other unknown person).

## VI.    IJ's December 24, 2024 Denial Of Mr. Ortega's Application

On December 24, 2024, the IJ found Mr. Ortega's claim was credible and, nevertheless, denied his CAT deferral request for failure to satisfy his burden of proof.  AR 82-96; *see also* 8 C.F.R. § 1208.16(c)(1) and (2) (requiring the alien to show it is "more likely than not that he or she would be tortured if removed to the proposed country of removal.").  At the outset, the IJ noted its consideration of Mr. Ortega's theories of torture by the same or different individuals and the Salvadoran government because of a combination of his sexual orientation, his daughter's gang affiliation to MS-13, and his criminal deportee status, both individually and in the aggregate.  AR 92.  Noting the relevance of his sexual abuse by Virgilio and Julio whilst still a minor and "assum[ing]" Mr. Ortego experienced past torture, the IJ noted the other requirements for CAT deferral.  AR 92.

The IJ first considered Mr. Ortega's claim of torture in a non-detained context, from the same and different individuals who previously harmed him because of his known sexual orientation, criminal deportee status, and his daughter's gang affiliation and found it "too speculative to meet the standard for CAT protection."  AR 92 (citing *Matter of J-F-F-*, 23 I. & N. Dec. 912, 917-918 (BIA 2006)).  In his analysis, the IJ specifically named and addressed Mr. Ortega's experiences with Virgilio and Julio, unidentified

15

persons in Chalchuapa in 1986 and El Pinalito in 1989, his former commander, the unknown gang members in Santa Ana, and the unidentified gang member who cut him in 2008. AR 92. The IJ reasoned that Mr. Ortega's claim was based on supposing that these individuals, some of whom attacked him several decades ago, and whose location and identity are unknown by Mr. Ortega, have maintained an interest in him, would learn about his return and seek to harm him again. AR 92-93.

As to his fear of torture by different individuals, gang members or government officials, the IJ "finds this theory is too speculative as well." AR 93. While acknowledging Dr. Hallett's report and testimony that Mr. Ortega does not conform to dominant forms of male sexuality under Salvadoran culture, the IJ found this "vulnerability to violence does not equate the necessary likelihood of experiencing torture." AR 93 (citing *Matter of M-A-M-Z-,* 28 I. & N. Dec. 173, 177 (BIA 2020); *Matter of J-J-G-*, 27 I. & N. Dec. 808, 817 (BIA 2020); the USDOS Report, HRW Summary). In support of this finding, the IJ noted Mr. Ortega last interacted with people in El Salvador approximately sixteen years ago; he had not been in contact with his family for the last three years; and he had no prior criminal history or gang affiliation in El Salvador. AR 94. Because he failed to show a likelihood of torture outside detention, the IJ declined to

16

consider whether he showed a clear probability that a public official would acquiescence to the alleged torture. *Id*. (citing *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976), holding that, "[a]s a general rule courts and agencies are not required to make findings on issues the decision").

Additionally, the IJ considered Mr. Ortega's claimed fear of torture in El Salvador as a criminal deportee with suspected gang affiliation, who might be arrested and detained at the airport and tortured in prison due to his criminal deportee status, suspected gang affiliation and sexual orientation. AR 94. The IJ specifically noted Mr. Ortega's evidence that local human rights organizations and media reports registered "327 cases of enforced disappearances, more than 78,000 arbitrary detentions -- with a total of approximately 102,000 people now deprived of their freedom in the country - a situation of prison overcrowding of approximately 148%, and at least 235 deaths in state custody." AR 94 (citing the Amnesty International article at AR 1219, and noting evidence of quotas for police officer arrests, overcrowded prisons and deaths due to illness and fighting among inmates). *Id*. The IJ also specifically noted Dr. Hallett's testimony that, as of March 2022, there had been a major shift in the system to control gang activities, including mass arrests, restrictions on due process, and targeting certain

17

neighborhoods and people deemed undesirable. AR 94-95 (citing AR 1114-47).

Prior to its analysis, the IJ correctly defined "torture" under the regulations implementing the CAT and cited *Pierre v. Gonzales*, 502 F.3d 109 (2d Cir. 2007) and *Matter of J-R-G-P-*, 27 I. & N. Dec. 482 (BIA 2018). AR 95. Assuming Mr. Ortega's arrest and detention based on his criminal deportee status, suspected gang affiliation, sexual orientation or a combination of these three factors and despite the demonstrated poor prison conditions, the IJ found the evidence failed to establish Mr. Ortega's anticipated treatment in Salvadoran prison will more likely than not rise to the level of torture. AR 95. The IJ considered the country conditions evidence of abuse in prisons, including beatings by guards, sporadic complaints of mistreatment by police, and use of electric shocks, and found such conditions did not appear to be intentionally inflicted for purposes of torture. *Id*. (citing USDOS Report, HRW Summary, Amnesty Internationalarticle and Dr. Hallett's affidavit). Thus, the IJ denied Mr. Ortega's CAT deferral request and ordered him removed to El Salvador. *Id*.

## VII. The Board Affirms The IJ's Denial Of CAT Deferral

On June 11, 2025, the Board denied Mr. Ortega's appeal. AR 1-6. The Board summarized the procedural history of the removal proceedings.

18

AR 3-4. The Board adopted and affirmed the IJ's decision for the reasons stated, with several notations. AR 4 (citing *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994)). The Board agreed with the IJ's termination of Mr. Ortega's grant of statutory withholding of removal and finding that Mr. Ortega failed to establish eligibility for CAT deferral. *Id.* Dismissing Mr. Ortega's contention, the Board found the IJ did not err by considering "all reliable information" to determine whether his conviction for third-degree rape in violation of NYSPL § 130.25(2) was particularly serious. *Id.* (citing *Matter of N-A-M-*, 24 I. & N. Dec. 336, 341 (BIA 2007)). The Board also determined that the record did not support the claim that the IJ did not give appropriate weight to Mr. Ortega's past torture in El Salvador. AR 4 (citing *Suzhen Meng v. Holder*, 770 F.3d 1071, 1076 (2d Cir 2014)). The Board discerned no error in the IJ's weighing of the record evidence. AR 4-5 (citing *Matter of D-R-*, 25 I. & N. Dec. 445, 455 (BIA 2011).

Moreover, the Board concluded that Mr. Ortega had not shown "clear error" in the IJ's factual findings supporting his conclusions. AR 5 (citing *Cooper v. Harris*, 581 U.S. 285, 288, 309 (2017); *Matter of R-S-H-*, 23 I. & N. Dec. 629, 637 (BIA 2003); *Mu Xiang Lin v. U.S. Dept of Just.*, 432 F.3d 156, 160 (2d Cir. 2005)). The Board rejected Mr. Ortega's claim that the IJ did not consider his risk of abuse by prison guards within the Salvadoran

19

prison system.  AR 5 (citing *Matter of A-A-R-*, 29 I. & N. Dec. 38 (BIA 2025); *Wang v. Ashcroft*, 320 F.3d 130, 144 (2d Cir. 2003)).  Considering his claim on appeal, the Board concluded that the IJ "permissibly determined that [he] did not establish a particularized risk of torture or a showing of intentional infliction of severe pain or suffering."  AR 5-6 (citing AR 94-96).

This petition for review followed.

## SUMMARY OF THE ARGUMENT

The Court should deny Mr. Ortega's petition for review because the evidence does not compel reversal of the agency's determination that he did not demonstrate it is more likely than not that he would be tortured if removed to El Salvador based on his criminal deportee status, suspected gang affiliation, sexual orientation, or a combination of any of these three factors.  The record evidence supports the agency's finding that Mr. Ortega's fear of torture is speculative, as there is insufficient evidence to support that he will be targeted and tortured by the same or different individuals who harmed him in the past or gang members upon his return to El Salvador.  There is also insufficient evidence to support that Mr. Ortega will be targeted and imprisoned by the Salvadoran government upon his return to El Salvador.  As such, he has necessarily failed to establish that it is more likely than not that he will then be detained and tortured, either by Salvadoran

20

officials or detained gang members. Furthermore, country conditions evidence indicating that human rights violations occur El Salvador due to the State of Exception is, on its own, insufficient to demonstrate that Mr. Ortega specifically faces a likelihood of torture. Because the record supports the agency's determination that Mr. Ortega failed to meet his evidentiary burden of demonstrating eligibility for CAT deferral, the Court should deny Mr. Ortega's petition for review.

## ARGUMENT

### I. Standard And Scope Of Review

Where the Board adopts and affirms portions of the IJ's decision, citing *Matter of Burbano* and adds additional commentary, this Court reviews both decisions to the extent that the Board agreed with the IJ's decision. *Chen v. BIA*, 435 F.3d 141, 144 (2d Cir. 2006).

Congress by statute "provides that a reviewing court must accept 'administrative findings' as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (reviewing agency's factual determinations for substantial evidence); *Manning v. Barr*, 954 F.3d 477, 484 (2d Cir. 2020) (reviewing agency's CAT deferral determination for

21

substantial evidence).  As a unanimous Supreme Court recently emphasized, "[t]he only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Jagdeep Singh v. Garland*, 11 F.4th 106, 113 (2d Cir. 2021) (quoting *Ming Dai*, 593 U.S. at 368 (emphasis in original)).  The substantial evidence standard does not permit the Court to reverse an agency decision simply because it disagrees with the agency's evaluation of the facts.  *Joaquin-Porras v. Gonzales*, 435 F.3d 172, 181 (2d Cir. 2006); *see American Textile Mfrs. Inst., Inc., v. Donovan*, 452 U.S. 490, 523 (1981)) ("[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (quoting *Consolo v. FMC*, 383 U.S. 607, 620 (1966)).

## II.    Applicable Law And Burden Of Proof - CAT Deferral

Because of his conviction for the offense of rape in the third-degree in violation of NYSPL § 130.25(2), Mr. Ortega may apply for CAT protection only "in the form of deferral of removal."  8 C.F.R. §§ 208.16(c), 208.17(a); 8 C.F.R. § 1208.17(a).  The IJ is required to grant CAT deferral if the alien can establish the likelihood of torture upon return.  *See* 8 C.F.R. § 208.17(a).  A CAT deferral applicant must show "it is more likely than not that he [] would be tortured if removed to the proposed country of removal."  8 C.F.R.

22

§ 1208.16(c)(2). The more likely than not standard "requires the applicant to establish that there is greater than a fifty percent chance . . . that he will be tortured." *Chun Gao v. Gonzales*, 424 F.3d 122, 128–29 (2d Cir. 2005). For an act to constitute torture, it must be:

- an act causing severe physical or mental pain or suffering;

- intentionally inflicted;

- for a proscribed purpose;

- by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and

- not arising from lawful sanctions.

*See Id*. at 1208.18(a); *Matter of J-E-*, 23 I. & N. Dec. 291, 296 (BIA 2002).

Torture is "an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Further, in assessing whether it is more likely than not an applicant would be tortured in the proposed country of removal, the IJ should consider all the evidence, including "relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3)(iv).

As part of the same requirement for proving likelihood of future events, if the applicant's claim that future torture is likely depends on a

chain of events, each event in the chain must be more likely than not. In *Matter of J-F-F-*, an IJ granted CAT protection to an applicant from the Dominican Republic who had a diagnosis of schizoaffective and bipolar disorders, on the theory that the applicant needed mediation to behave within the bounds of the law; that such medication was not available in the Dominican Republic; that without medicine, he would become rowdy; that his rowdiness would cause the police to incarcerate him; and that during the incarceration, police would torture him. 23 I. & N. Dec. at 917. The Attorney General certified the case and reversed, stating that the evidence did not show that each event in the "string of suppositions" was clearly probable: "[a]n alien will never be able to show that he faces a more likely than not chance of torture if one link in the chain cannot be shown to be more likely than not to occur. It is the likelihood of all necessary events coming together that must more likely than not lead to torture, and a chain of events cannot be more likely than its least likely link." *Id*. at 918 n.4; *Savchuck v. Mukasey*, 518 F.3d 119, 123 (2d Cir. 2008) (following *Matter of J-F-F-*).

### III. Mr. Ortega Has Failed To Establish That The Record Compels The Conclusion That He Is Eligible For CAT Deferral.

To establish eligibility for CAT deferral, Mr. Ortega was required to show that he would more likely than not face torture committed by or with

24

the consent or acquiescence of a public official in El Salvador. 8 C.F.R. § 1003.2(c)(1). Mr. Ortega was also required to supply evidence that someone with his characteristics has a clear probability of torture. *Mu Xiang Lin*, 432 F.3d at 159-60 (requiring "particularized evidence" beyond general country conditions to support a CAT claim"). He failed to do so.

### A. Mr. Ortega Failed To Show That Someone In His Circumstances Would Likely Face Torture

Outside of detention, Mr. Ortega fears he will be targeted and tortured by the same or different individuals who harmed him in the past, gang members or government officials because of his sexual orientation. AR 429-30; Petitioner's Opening Brief ("Pet. Br.") at 56-59. The record supports the agency's determination that Mr. Ortega is ineligible for CAT deferral because this fear is speculative. AR 4-5, 92-95; *Savchuck*, 518 F.3d at 124 (finding a CAT claim based on a chain of assumptions to be speculative); *Jian Xing Huang v. U.S. INS*, 421 F.3d 125, 129 (2d Cir. 2005) (reasoning, absent "solid support" in the record, a fear of persecution is "speculative at best").

As the agency determined, Mr. Ortega's subjective belief that he will be singled out for torture in El Salvador depends on "stringing together suppositions." AR 92; *see Savchuck*, 518 F.3d at 124 (holding "an alien will never be able to show that he faces a more likely than not chance of torture

25

if one link in the chain cannot be shown to be more likely than not to occur. It is the likelihood of all necessary events coming together that must more likely than not lead to torture, and a chain of events cannot be more likely than its least likely link."). He claims that he will be targeted and tortured by people who harmed him in the past (such as Virgilio, Julio, Yana, neighborhood kids, and people in Chalatenango, Chalchuapa and El Pinalito) based on his sexual orientation. AR 164-66, 167-69, 170-71, 175-76, 454-56. But there is no particularized evidence in the record to support his belief that his sexual orientation will bring him to the attention of these individuals, "some of whom are unknown by [him], some of whom attacked [him] years ago, [and who have not shown they are] still interested in harming him." AR 92; *Matter of J-F-F-*, 23 I. & N. Dec. at 917-18.

In this regard, Mr. Ortega offered no particularized evidence to meet his high burden of showing that his sexual orientation would more likely than not lead to his torture by the same individuals who harmed him in the past. AR 92. He offered no evidence that any of these individuals [some of whom harmed him as a child/young adult in the 1960s and 1970s] are anticipating his return to El Salvador. *See* AR 164-67, 454-56; *see Loka-Sacasari v. Garland*, 2024 WL 3948995 *2 (2d Cir. 2024) (finding fear of torture speculative where the petitioner "last spoke to her ex-husband in

26

2016 and did not know if he was in Ecuador"). He also offered no evidence that any of these individuals remain interested in harming him and would "go out and seek to harm him again." AR 92. Mr. Ortega attempts to provide information to establish a particularized risk, claiming that his son named Jose was attacked by gang members for not having permission to enter a certain area and because Mr. Ortega is an effeminate gay man. AR 414-15, 419. He also says that when he resisted her financial extortion, his daughter, Fidelina, who is in a romantic relationship with an MS-13 gang member, threatened to harm him upon his return to El Salvador. AR 1456. But while Mr. Ortega testified generally that these family members in El Salvador have been harmed or have taunted him because of his sexual orientation, he offered no further details concerning his risk of harm upon returning to El Salvador. *See* AR 414-15, 419, 1456. Indeed, Mr. Ortega's general references to Jose's harm and Fidelina's threats fail to establish such incidents are particularized to his situation. *See id*.

As to his claimed fear of torture from different individuals, gangs and the Salvadoran government because of his sexual orientation if he is not detained, the IJ found it "speculative as well." AR 93. Mr. Ortega proffered Dr. Hallett's expert witness affidavit and testimony about the cultural significance of his childhood sexual encounters with older men, and the

27

homophobia and stigma reserved for effeminate men in El Salvador. AR

1114-47. He also relied on country conditions evidence. *See e.g.* USDOS

Report at AR 1163-1206, HRW at AR 1208-15, HRW Summary at AR

1226-87. But the agency, while acknowledging this evidence and any

"vulnerability to violence," reasonably determined that it was insufficient to

demonstrate that Mr. Ortega personally would face a clear probability of

torture in El Salvador. AR 4, 93; *Mu Xiang Lin*, 432 F.3d at 158 (requiring

"particularized evidence suggesting that [an applicant] is likely to be

subjected to torture"); *Matter of J-J-G-*, 27 I. & N. Dec. at 817 (stating that

generalized evidence of violence and crime in a country is insufficient to

establish it is more likely than not that an applicant would be tortured).

Mr. Ortega claims that he met this burden because he supported his

general country conditions evidence with Dr. Hallett's expert witness

affidavit and testimony that corroborates the violence against LGBT[I+]

individuals and evidence of underreporting. Pet. Br. 57-58. While it is true

that this Court has ruled that the agency errs by overlooking key evidence

and mischaracterizing the record, *see* Pet. Br. at 56-57 (citing *Doe v.

Sessions*, 886 F.3d 203, 211 (2d Cir. 2018) (in a case where the Board

"commit[ed] an error of law [because] 'important' facts have been 'totally

overlooked and others have been seriously mischaracterized'")), the record

28

does not compel the conclusion that the agency did so here. In *Doe*, the Court took issue with the agency's erroneous conclusion that the alien "conceded that his co-defendants were unaware that he had cooperated with the Government in his criminal case when, in fact, he both argued and presented evidence to the contrary." *See id*. Here, the IJ specifically acknowledged the record evidence of "homophobic and transphobic violence and discrimination by police, gangs, and the general public," and noted "that as of July 26, 2024, thirteen LGBT persons were victims of sexual assault or harassment in 2023." AR 93. It was within the IJ's discretion to determine whether Mr. Ortega's evidence established that he would more likely than not be tortured. And his conclusion on that point was reasonable based on the record evidence. AR 4-5, 92-94. Substantial evidence supports the agency's determination and while the opposite conclusion could have been drawn; this Court may not reweigh the evidence. *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1996) (holding, even "the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the Board's] finding from being supported by substantial evidence"); *Quintanilla-Mejia v. Garland*, 3 F.4th 569, 592 (2d Cir. 2021) (holding that under the substantial evidence standard, where "the agency's conclusion finds support in record evidence," a petitioner "cannot

29

secure ... relief by pointing to conflicting evidence that might support—but not compel—a different conclusion."); *see also Joaquin-Porras v. Gonzales*, 435 F.3d 172, 181 (2d Cir. 2006) (observing that substantial evidence standard does not permit Court to reverse agency ruling simply because it may disagree with the agency's evaluation of the facts).

Substantial evidence also supports the agency's determination that, even assuming arguendo that he would be arrested and detained in El Salvador, the record, including the USDOS Report, did not establish that Mr. Ortega would more likely than not be tortured based on his criminal deportee status, suspected gang affiliation, sexual orientation or a combination of the three. AR 4-5, 94-95. The Board acknowledged that the USDOS Report "docum[ented] abuse and some deaths [by prison guards] during incarceration." AR 5 (referring to the IJ's decision at AR 95). The USDOS Report indicated that the "human rights nongovernmental organization (NGO) Socorro Juridico Humanitario recorded the deaths of 79 detainees as of August 16 and determined that 33 of the deaths were violent. AR 1164. The human rights organization Cristosal confirmed 71 deaths of detainees and determined that 13 of the deaths showed signs of violence, including beatings by a club or baton." AR 1164. Nevertheless, the USDOS Report does not establish that a gay effeminate man like Mr. Ortega, who

30

may be detained based on his criminal deportee status, suspected gang affiliation, and sexual orientation, or a combination of these three factors is more likely than not to face torture in El Salvador.

Assuming arguendo that this Court were to recognize as credible the reports of one hundred and fifty detainee deaths, none of which are duplicates, and forty-six of those deaths were caused by violence intentionally inflicted in each instance by a prison guard and underreporting, the USDOS Report fails to support Mr. Ortega's claim. *See* AR 1164. The death of 150 detainees, while unquestionably unfortunate, represents a small number in comparison to the 71,776 detainees that the USDOS Report says were imprisoned during the State of Exception and thus does not meet the more likely than not standard (greater than 50 percent) applicable to CAT deferral claims. *See* AR 1169 (USDOS Report stating that El Salvador had 71,776 detainees); *see also Lin*, 432 F.3d at 156; *Chun Gao*, 424 F.3d at 128-29 (The more likely than not standard "requires the applicant to establish that there is greater than a fifty percent chance . . . that he will be tortured."). Although perhaps shocking to our sensibilities in the United States about how to best and most humanely treat detainees, these practices do not by their very nature "compel the conclusion that they were intended to inflict pain." *Yan Chen v. Gonzales*, 417 F.3d 268 (2d Cir. 2005)

31

(substantial evidence is "'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'").

Contrary to his claim, Mr. Ortega's risk of torture from unintentional overcrowding and limited access to healthcare and medicine, as is the case for detainees in the Salvadoran penal system, does not meet the definition of torture under the CAT. *See* 8 C.F.R. § 1208.18(a). While providing minimal food, such as in the case of released detainees at two prisons who claimed they were given only two tortillas, one spoonful of beans and one glass of water per day, may be inadequate, food rationing in and of itself is not torture – and is not likely representative of how the majority of detainees were fed daily, given that there were no reports of mass starvation in Salvadoran prisons. *See* AR 1169-70; *see also* AR 1274 (after visiting the Mariona and Izalco prisons, then-Human Rights Ombudsman said "detainees were receiving three meals a day and had access to daylight as well as adequate access to healthcare"). Thus, while the evidence indicates that concerning incidents have occurred in two Salvadoran prisons, it does not support Mr. Ortega's contention that he would more likely than not be detained and experience the same conditions as the previously-discussed detainees. *Compare* AR 1169-70 (based on reports by prior detainees at two

32

prisons) *with* AR 1169 (USDOS Report stating that El Salvador had 71,776 detainees). Ultimately, this evidence does not demonstrate that Mr. Ortega is more likely not to face torture, when the evidence suggests that such a small percentage of detainees face such treatment and Mr. Ortega proffered no evidence to meet his burden to present "particularized evidence" that he would be subject to torture. *See* Mu Xiang Lin v. Department of Justice, 432 F.3d 156, 158 (2d Cir. 2005); *Chun Gao*, 424 F.3d at 128-29 (The more likely than not standard "requires the applicant to establish that there is greater than a fifty percent chance . . . that he will be tortured.").

The USDOS Report and Human Rights Watch Summary indicate that difficult conditions have historically been a problem in the Salvadoran prison system, and overcrowding has been exacerbated by the recent State of Exception which has implemented policies, including "arbitrary arrests and mass pretrial hearings" in response to gang violence. *See e.g.* AR 1163; *see also* AR 1166 ("On March 27, the minister of justice and public security announced that investigations into disappearances would remain suspended, *as authorities continued to prioritize capturing gang members.*"); AR 1169 ("Prison conditions before the state of exception were harsh and life threatening due to gross overcrowding, inadequate sanitary conditions, insufficient food and water shortages, a lack of medical services in prison

33

facilities, and physical attacks. *The addition of 72,000 detainees under the state of exception exacerbated the problem*); AR 1226 (reporting on 92 deaths in a three-day period and "[i]n response, and at the request of President Nayib Bukele, the Legislative Assembly promptly adopted a 30-day 'state of emergency,'" suspending a range of constitutional rights).

Dr. Hallet's expert witness affidavit details a penal system in El Salvador that is "beyond overburdened and inadequate, and conditions [that] are horrific." AR 1137 (saying, "[e]ven before the mass detentions of 2022-23 in which over 70,000 additional people have been rounded up and imprisoned, *El Salvador's penal system was among the most overcrowded and overextended in the hemisphere with around 40,000 people incarcerated in facilities built with a capacity to hold around 27,000*") (emphasis added); *id.* (saying the State Exception "has greatly exacerbated overcrowding and deadly conditions in prisons *despite construction of a few new penal institutions*. Images of prisoners packed like sardines in the newly constructed 'supermax' style prison in El Salvador circulated broadly in media in 2023") (emphasis added); *id.* (describing the "old and makeshift assortment of cinder block warehouse-style buildings and cages still making up the majority of El Salvador's penal infrastructure, and that have been overcrowded and crumbling for decades"); (saying "[c]onditions in El

34

Salvador's prisons are so inhumane that the Supreme Court of El Salvador (before its members were summarily removed in 2020) declared them unconstitutional"). While she claims detention in El Salvador is tantamount to torture, she makes no distinction between whether such conditions and treatment are intentionally or unintentionally inflicted by the authorities, are common throughout all prisons, or experienced by a majority of detainees. *See* AR 1137. Indeed, when asked whether prison conditions were caused "intentionally by the El Salvadoran state" or a lack of resources, Dr. Hallett said she "really can't speak to the intention of the government." AR 378.

To establish "specific intent," Mr. Ortega argues that overcrowding, food rationing, deprivation of health care in prisons occurs "at the direction of higher-ranking officials, including President Bukele himself." Pet. Br. at 62-64 (referring to President Bukele's social media posts); *but see* 8 C.F.R. § 1208.18(a)(3) ("[t]orture does not include pain or suffering arising only from . . . lawful sanctions," which include "*judicially imposed sanctions and other enforcement actions authorized by law*.") (emphasis added); AR 1165 (noting the State of Exception was enacted by El Salvador's Legislative Assembly to address that country's longstanding problem with pervasive gang violence). These, however, are insufficient evidence of specific intent as they are clearly meant to intimidate current gang members and appeal to

35

his supporters. Moreover, such pronouncements and tweets are not a formal policy memorandum, nor a reliable indication of actual plans by the Salvadoran authorities. In any event, while those statements may be deemed offensive, they do not describe intentional harm rising to the level of torture. Based on the record, the conditions in Salvadoran prisons appear to be the unfortunate result of mismanaging an overcrowded penal system in a country struggling to control gang violence. *See e.g. Pierre*, 502 F.3d at 121 ("Even though Haiti's government does apparently wish to intimidate criminal deportees by imprisoning them in whatever prisons are available, the agency found that neither the government nor its agents have any specific intent to cause severe suffering through harsh conditions as an additional means of intimidation—the poor conditions result chiefly from the economic situation in Haiti. Therefore, imprisonment in Haiti without more is not torture").

Mr. Ortega further argues that "it is clear that the 'intent of the authorities' in El Salvador is to 'punish' those imprisoned and 'intimidate' gang members by means of horrific prison conditions." Pet. Br. at 65 (citing *Villalta Martinez v. Bondi*, 157 F.4th 108 (2d Cir. 2025)). While some of the evidence proffered to the agency in *Villalta Martinez* might be the same here, the alien's circumstances differed from Mr. Ortega's and, as shown

36

above, the Board provided sufficiently considered Mr. Ortega's claim.

*Compare Villalta Martinez*, 157 F.4th at 111 (describing the alien's fear of

torture under the State of Exception as a perceived gang member because of

his tattoos and criminal history) *with* AR 165-69, 172-82, 416, 453-55 (Mr.

Ortega's claim based on his criminal deportee status, suspected gang

affiliation based on his estranged daughter and his sexual orientation).

Moreover, in *Villalta Martinez*, the Court granted the petition fore review

because it determined "the BIA gave insufficient justification for its clear

error finding." 57 F.4th at 118; *see also id*. 110, 114-118 (finding

insufficient justification for Dr. Boerman's testimony, which was

corroborated by various sources, and evidence of the Salvadoran

government's suppression of public information of its actions). Here, the

record evidence does not compel the conclusion that the agency did not

consider all the record evidence and substantial evidence supports the

agency's determination. *See Bhagtana v. Garland*, 93 F.4th 592, 594 n.5

(2d Cir. 2023) (*citing Garland v. Ming Dai*, 593 U.S. 357, 366, 141 S. Ct.

1669, 1677, 210 L.Ed.2d 11 (2021) ("[S]o long as the record contains

contrary evidence of a kind and quality that a reasonable factfinder could

find sufficient, a reviewing court may not overturn the agency's factual

determination." (internal quotations marks omitted))); *see also Garland v.*

37

*Ming Dai*, 593 U.S. at 368 ("The only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." (emphasis in original)).

**B.      The Agency Specifically Considered That Mr. Ortega Was Last Harmed As A Child/Young Adult Twenty Years Ago.**

In his opening brief, Mr. Ortega claims that the agency "erroneously equated [his] particular circumstances with those of all LGBTQI+ individuals at large," specifically claiming the agency "fail[ed] to consider how [his] extensive history of past harm impacts his risk of future torture." Pet. Br. at 29-36.  This is incorrect.  The IJ's opinion evidences his specific and proper consideration of Mr. Ortega's past torture when he concluded that he failed to establish Mr. Ortega would more likely than not be tortured in the future in El Salvador.  AR 4, 91-92.  The IJ specifically pointed to Mr. Ortega's testimony of molestation and sexual abuse as a child by Virgilio and Julio, AR 85, 91, and Mr. Ortega's testimony of verbal and physical abuse by Yana, neighborhood kids, persons in Chalatenango, Chalchuapa and El Pinalito, during his work as a military command headquarters.  AR 85-86.  The IJ noted Mr. Ortega's claim based on "a combination of his sexual orientation, daughter's gang affiliation, deportee status, and criminal record."  AR 91.  In its analysis of the claim, the IJ "assume[d] that [he] experienced past torture."  AR 92 (citing *Matter of H-C-R-C-*, 28 I. & N.

38

Dec. 809, 813 (BIA 2024)). The Board determined there was no clear error in that finding. AR 91 (citing 8 C.F.R. § 1208.18(a)(5); noting that past torture is merely one factor to be weighed against the possibility of relocation and country conditions).

The law is clear. When, as often happens, country conditions evidence shows that acts of torture have been reported in a country, but not that such acts are so "pervasive" that any person in the country, or even any prisoner, has a clear probability of torture, the applicant must supply evidence filling the probability gap that he would more likely than not be subjected to acts that satisfy the requirements of "torture." *Matter of J-E-*, 23 I. & N. Dec. at 303; *accord Lin*, 432 F.3d at 159-60 (although "some prisoners" in China "have been tortured," petitioner must show "someone in his particular alleged circumstances more likely than not would be tortured if imprisoned").

Mr. Ortega cites *Barwari v. Mukasey*, 258 F. App'x 383, 385 (2d Cir. 2007), but as shown above by the IJ's multiple references and analysis to his past experiences in El Salvador, this case does not assist him.[4] Pet. Br. at

---

[4] While conceding that *Nuru v. Gonzales*, 404 F.3d 1207 (9th Cir. 2005), has not been "expressly recognized by this Court," Mr. Ortega argues that his case "exemplifies the soundness of the Ninth Circuit's logic" to consider past torture as the "principal factor" when considering an alien's CAT claim. Pet. Br. at 33-34. Out of circuit cases, however, do not have binding

31-32, 35; *c.f. e.g.* AR 92 (IJ's decision noting "he argues that since he has had problems in the past, including facing brutal attacks as a result of his sexual orientation"); *id.* (IJ's decision saying he "presented further evidence that he and his family members have faced violence and treats as a result of his known sexuality"); *id.* (IJ's decision noting Mr. Ortega's claim of future harm "by the same individuals who have harmed in in the past because of his sexuality" and identifying specific past incidents); *id.* at AR 93 (IJ's decision acknowledging Dr. Hallet's report and testimony that his "childhood sexual encounters with, older men, who penetrated him, is culturally significant"). Contrary to his protestations, the IJ did not "analyze [his] risk purely by reference to 'LGBT[I+] persons' as a general population," or rest on "generalized framing," but viewed the country condition evidence plus Mr. Ortega's circumstances to conclude that his torture was not more likely than not. *See* AR 4, 91-92.

Regardless of any past torture, there is no "presumption" of future torture under the CAT implementing regulations. *See* 8 C.F.R. §§ 1208.16(c)(2), (3) (dictating, inter alia, that the burden to show likely torture is solely on the applicant without any suggestion that past torture

---

precedential effect on this Court, and Mr. Ortega's concession suggests there is no precedent in the Second Circuit for his position.

40

leads to a presumption of future torture); *see also Zelaya-Moreno v. Wilkinson*, 989 F.3d 190, 204 (2d Cir. 2021) (past torture does not give rise to a presumption of future torture but rather serves as evidence of the possibility of future torture); *Suzhen Meng v. Holder*, F.3d 1071, 1076 (2d Cir. 2014) (same).

While past torture is evidence of a likelihood of future torture, as noted above, it is one of three considerations enumerated in the regulation. 8 C.F.R. § 1208.16(c)(3),[5] *see also Huang v. Garland*, 2024 WL 4691005, at *3 (2d Cir. 2024) ("Assuming without deciding that the conduct Huang suffered [] constitutes torture, . . . Huang still did not establish that he would more likely than not be tortured in the future"); *Mbendeke v. Garland*, 860 F. App'x. 191, 195 (2d Cir. 2021) ("For example, the IJ acknowledged that Mbendeke had been tortured by her (now-deceased) stepfather as an adolescent . . . , but reasonably concluded that this did not show a risk of future torture because these events occurred when Mbendeke was young and she is now an adult"). Mr. Ortega did not testify that any of the people who had harassed, beaten or sexually abused him in El Salvador in the past had

---

[5] The other two factors to consider in determining the likelihood of future torture include: "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;" and human rights violations and other relevant country conditions. 8 C.F.R. § 1208.16(c)(3).

41

shown a continued interest or threatened to harm him in the future or have since threatened him. *See generally* AR 165-69, 172-82, 416, 453-55. Even assuming the now-middle aged Mr. Ortega was abused as a child/young adult in El Salvador more than twenty years ago by isolated individuals whose locations are unknown, the agency appropriately determined he failed to establish that it is more likely than not that he will be tortured upon his return, and no record evidence compels a contrary conclusion. AR 4, 91-95; *see also Zelaya-Moreno v. Wilkinson*, 989 F.3d 190, 204 (2d Cir. 2021) (past torture does not give rise to a presumption of future torture but rather serves as evidence of the possibility of future torture); *Suzhen Meng v. Holder*, F.3d 1071, 1076 (2d Cir. 2014) (same).

### C. Mr. Ortega Failed To Administratively Exhaust His Claim That The Agency Did Not Analyze His Risk Of Future Torture In The Detained Context.

While acknowledging that the IJ addressed his claim in a non-detained context, for the first time in his opening brief, Mr. Ortega also claims that the IJ ignored the "increased risk of harm associated with [his] sexuality in the detained context." Pet. Br. at 39-41. This argument fails because it was not administratively exhausted before the agency. *C.f.* AR 8, 10 and 22-32 (challenging solely the IJ's purported failures to weigh his past torture, review country conditions evidence relating to his risk of harm as an LGBT

42

person (as opposed to as a gay, effeminate person and; consider the risk of harm by private actors with the acquiescence of the Salvadoran government). Congress mandates that an alien exhaust his administrative remedies before raising an issue to the Court. 8 U.S.C. § 1252(d)(1); *see also Santos-Zacaria v. Garland*, 598 U.S. 411, 423 (2023) (holding that administrative exhaustion requirement in 8 U.S.C. § 1252(d)(1) is a non-jurisdictional claim-processing rule subject to forfeiture); *Punin v. Garland*, 108 F.4th 114, 124 (2d Cir. 2024) ("[W]hen an argument made to this Court cannot be closely matched up with a specific argument made to the BIA, it has not been properly exhausted and we cannot hear it."). Mr. Ortega's argument to the Board raised no complaint about the IJ's alleged failure to consider his increased risk of harm in detention based on his sexuality. AR 17-23.

In any event, to the extent the Court disagrees and determines the issue is administratively exhausted, the record shows the IJ analyzed the evidence regarding Mr. Ortega's risk of torture both in and out of detention based on his sexual orientation. AR 5 (holding the "record reflects the [IJ] permissibly considered the respondent's specific characteristics and circumstances relevant to his likelihood of future torture from all sources (IJ at 10-14)." For instance, the IJ noted Mr. Ortega "also argues that if

43

returned, he would be tortured in prison due to his criminal deportee status, his suspected gang affiliation, and *his sexual orientation*." AR 94 (emphasis added).

The IJ acknowledged Dr. Hallett's testimony that "people who are undesirable to the government or police are also easily targeted" and further noted Mr. Ortega "claims to belong to, an undesirable community, *as a person who is not conforming with Salvadoran gender norms*." *Id*. (emphasis added). After careful consideration, the IJ found "[a]ssuming [he] is arrested and detained based on his criminal deportee status, his suspected gang affiliation, *his sexual orientation*, or *a combination of these three factors*," that it was not more likely than not that the government would torture Mr. Ortega upon return. AR 95 (emphasis added). Mr. Ortega disagrees with the IJ's review of the evidence and the agency's conclusion, but the process and analysis is sound.

As this Court has recognized, the IJ is not required to "expressly parse or refute on the record each individual argument or piece of evidence offered." *See Ojo v. Garland,* 25 F.4th 152, 171 (2d Cir. 2022); *see also Jian Hui Shao v. Mukasey,* 546 F.3d 138, 169 (2d Cir. 2008); *Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 336 n.17 (2d Cir. 2006) ("[W]e presume that an IJ has taken into account all of the evidence before him, unless the record

44

compellingly suggests otherwise.").  Here, the record reflects direct

consideration of Mr. Ortega's past harm in El Salvador.

> **D.**    **Mr. Ortega Also Failed To Administratively Exhaust His Claims That The Agency Did Not Analyze His Risk Of Future Torture In The Aggregate, And Applied An Inflated Burden Of Proof To His Claim.**

The Court should decline to consider Mr. Ortega's contention that the

agency "erred by failing to properly consider whether [his] aggregate risk of

torture from all identified sources met the 'more likely than not standard'

applicable to claims under the Convention."  Pet. Br. at 41-46.  Similarly,

the Court should refrain from addressing his claim that the IJ "improperly

considered [his] personal risk of harm in the non-detained context under an

inflated likelihood-of-harm standard."  *Id*. at 54-55.  Those issues were not

raised before the IJ or included in Mr. Ortega's counseled agency brief and,

thus, they are not before this Court due to a failure to administratively

exhaust.  *See* AR 3-5, AR 8, 10 and 22-32; *see Santos-Zacaria*, 598 U.S. at

423; *Punin*, 108 F.4th at 124 ("[W]hen an argument made to this Court

cannot be closely matched up with a specific argument made to the BIA, it

has not been properly exhausted and we cannot hear it."); *see also Ud Din v.*

*Garland*, 72 F.4th 411, 419-20 & n.2 (2d Cir. 2023) (holding issue

exhaustion is a mandatory claim-processing rule "that a court must enforce .

. . if a party properly raises it").

**E.** **The Court Should Reject Mr. Ortega's Remaining Arguments.**

A review of the record belies Mr. Ortega's argument that the IJ confined his no likelihood of future torture findings to prison conditions and "failed to properly consider [his] risk of torture directly at the hands of prison guards." Pet. Br. at 46-51. At the outset of the section addressing his "risk of torture in detention," the IJ specifically and correctly articulated that Mr. Ortega's claim of torture was "*in prison* due to his criminal deportee status, his suspected gang affiliation, and *his sexual orientation*." AR 94 (emphasis added).

As noted above, the IJ further and fully considered Mr. Ortega's risk of torture as a detainee from the prison guards. AR 94. Indeed, the IJ specifically relied on the Amnesty International article proffered by Mr. Ortega entitled "*El Salvador: The Institutionalization of Human Rights Violations After Two Years of Emergency Rule.*" AR 93 (at AR 1218-20). The article noted that "[a]s of February 2024, [there were] 327 cases of enforced disappearances, more than 78,000 arbitrary detentions -- with a total of approximately 102,000 people now deprived of their freedom in the country - a situation of prison overcrowding of approximately 148%, and at least 235 deaths in state custody." AR 1219. Of those 235 reported deaths,

46

there is no indication whether they were caused by prison guards, other detainees, or pre-existing medical conditions. *See* AR 1219-20.

The IJ also specifically noted "the *country conditions evidence that reports systematic abuse in the Salvadoran prison system, including beatings by guards, sporadic complaints of mistreatment by police, and use of electric shocks*. See Ex. R-4, Tab A [at AR 1162-1206]"). AR 95. Notwithstanding such evidence, the IJ found "that these conditions do not appear to be intentionally inflicted for the purposes of torture. Instead, *they are secondary or tangential results of El Salvador's implementation of discipline implementing an aggressive policy to combat gang and criminal problems* as supported by the record evidence and Dr. Hallett's affidavit. See id., Tabs A, C, and E [at AR 1162-1206, 1218-20, 1288-1350]; see also Ex. R-5 M [at AR 1114-47]." AR 95 (emphasis added).

Mr. Ortega's claim that the IJ "exclusively reference[d] case law in the context of a government's failure to maintain adequate prison conditions," Pet. Br. at 47-48, is not accurate. AR 95 (citing *Pierre v. Gonzales*, 502 F.3d 109 (2d Cir. 2007), and *Matter of J-R-G-P-*, 27 I. & N. Dec. 482). In citing *Pierre* at the outset of the analysis, the IJ appropriately laid out longstanding Second Circuit precedent defining "torture" in the context of specific intent and applicable to prison guards and prison

47

conditions. In *Pierre*, the petitioner argued that the "specific intent standard," as enumerated in *Matter of J-E-*, was "an impermissible narrowing of the CAT," and therefore, not entitled to deference. 502 F.3d at 116. *Matter of J-E-*, in turn, discussed when harsh prison conditions can constitute intentional infliction of torture under the CAT explaining, "[i]n order to constitute torture, the act must be specifically intended to inflict severe pain or suffering." *Id*. at 300. Under this standard, even "rough and deplorable treatment . . . does not amount to torture." *Id*. Likewise, evidence of "isolated acts of torture" in prisons is "insufficient." *Id*. at 303. And the IJ's citation to *Matter of J-R-G-P-*, was appropriate as that decision explained that an IJs predictive findings as to what may happen to the applicant in the country of removal and whether a specific intent to inflict torture has been shown are both findings of fact. 27 I. & N. Dec. at 484.

On appeal, the Board determined the "*IJ considered the country conditions evidence documenting abuse and some deaths during incarceration but*, as in *Matter of A-A-R-*, found it was insufficient to establish it was more likely than not [Mr. Ortega] would be tortured." AR 5 (emphasis added). The Board appropriately relied on *Matter of A-A-R-* where it specifically addressed the issue of whether the Salvadoran government's detention of former and current gang members under its State

48

of Exception policy is motivated by a specific intent to inflict torture on those who are detained and found, as it did in Mr. Ortega's case, that such a specific intent was absent. *Id.* at 43. The Board explained:

> Specific intent for purposes of CAT protection requires 'a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act.' . . . Mere knowledge that a result is substantially certain to follow from one's actions is not sufficient to form the specific intent to torture.' *Id.* Although "[k]nowledge that pain and suffering will be the certain outcome of conduct may be sufficient for a finding of general intent[,] . . . [it] is not enough for a finding of specific intent."
> *Id.*

29 I. & N. Dec. at 43. The Board recognized that certain Salvadoran public officials have made public comments "suggesting that they believe gang members deserve the dangerous and unsanitary conditions they experience in Salvadoran prisons," which are like the comments made in this case. *Id.* (internal citations omitted). But the Board rejected these statements as evidence establishing a specific intent to inflict severe pain or suffering on detainees, and criticized the IJ below for inferring from these statements that prison conditions were intentionally created and maintained in order to torture the detainees. *Id.* at 43-44. Instead, the Board held:

> This evidence reflects the public officials' moral judgment about gang members. The correlation between public officials' disdain for gang members and the harsh prison conditions, however, does not

49

> necessarily indicate intent. We should not simply assume that elected officials have a specific intent to torture based solely on disparaging comments about gang members. For example, it is not clear that the Immigration Judge considered whether such statements advertising the dire conditions may be intended to serve political purposes and garner public support, as well as to deter individuals in the community from engaging in gang activity.

*Id.* at 44. For the reasons explained in *Matter of A-A-R-*, Mr. Ortega's claims do not provide compelling evidence of a specific intent to cause severe pain or suffering. 29 I. & N. Dec. at 43-44.

Much like the petitioner in *Andrade v. Bondi*, 2026 WL 125260 (2d Cir. Jan. 26, 2026) (unpublished), Mr. Ortega claims that the agency failed to adequately consider "whether individual actors within the prison system would torture [him] with the necessary specific intent." Pet. Br. at 48; *see also Andrade*, 2026 WL 125260 at *2-3. However, to the extent Mr. Ortega claims that the Board failed to consider relevant evidence, this contention is without merit. As shown above, the record establishes the Board was aware of the claim of torture by prison guards and the proffered evidence, considered it, and found the IJ "permissibly determined that [he] did not establish a particularized risk of torture or a showing of intentional infliction of severe pain or suffering." *See* AR 4-5, 95. Indeed, as shown above, the IJ explicitly acknowledged Mr. Ortega's individual facts and claims arising

50

therefrom. *Id*. Moreover, the IJ identified and discussed Mr. Ortega's proffered evidence and entered individualized findings as required by this Court. *See Pierre*, 502 F.3d at 121-22.

Here, Mr. Ortega simply disagrees with the agency's resultant conclusion, but "substantial evidence review does not contemplate any judicial reweighing of evidence, it only allows the Court to ask whether record evidence compels a finding different from that reached by the agency. *Quintanilla-Mejia*, 3 F.4th at 593. In sum, Mr. Ortega's claims are based on speculation as to what might happen, rather than evidence that meets his burden of demonstrating that it is more likely than not that he will be subjected to torture in El Salvador. *Manning*, 954 F.3d at 484; *Banegas Gomez v. Barr*, 922 F.3d 101, 109 (2d Cir. 2019). Critically, the evidence in the record does not compel the conclusion that Mr. Ortega personally would face a clear probability of torture in El Salvador, which he must show to prevail. *See Mu Xiang Lin*, 432 F.3d at 159-60. Put another way, even if there is some evidence in the record that may weigh against the agency's determination that Mr. Ortega was not entitled to CAT deferral because he did not establish a particularized risk of future torture, the evidence does not compel the opposite conclusion under the substantial evidence standard of

51

review. *See Ming Dai*, 593 U.S. at 365. And because that is so, the Court should deny this petition for review.

## CONCLUSION

For the foregoing reasons, the Court should deny Mr. Ortega's petition for review.

Respectfully submitted,

**BRETT A. SHUMATE**
Deputy Assistant Attorney General

**BERNARD A. JOSEPH**
Senior Litigation Counsel

/s/ *Enitan O. Otunla*
**ENITAN O. OTUNLA**
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-9517

April 21, 2026                Attorneys for Respondent

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the typeface, style, and volume requirements of Fed. R. App. P. 32(a)(5), (a)(6) & (a)(7)(B), respectively, because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016, in font size 14-point, style Times New Roman, and it contains 11,573 words.  Under Local Rule 32(a)(1)(E), counsel for Respondent hereby certifies that the PDF version of Respondent's Brief has been scanned for viruses and no virus has been detected

*/s/ Enitan O. Otunla*
ENITAN O. OTUNLA
Trial Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system.

Petitioner's counsel at the Prisoner's Legal Services of New York (PLS-NY) are registered ACMS users and will be served by the appellate ACMS system.

/s/ *Enitan O. Otunla*
ENITAN O. OTUNLA
Trial Attorney
Office of Immigration Litigation
